**In re WORLDCOM, INC. SECURITIES LITIGATION**

Nos. 02 Civ.3416, 02 Civ.3419, 02 Civ.3508, 02 Civ.3537, 02 Civ.3647, 02 Civ.2750, 02 Civ.3771, 02 Civ.4719, 02 Civ.4945, 02 Civ.4946, 02 Civ.4958, 02 Civ.4973, 02 Civ.4990, 02 Civ.5057, 02 Civ.5071, 02 Civ.5087, 02 Civ.5108, 02 Civ.5224, 02 Civ.5285, 02 Civ.8226, 02 Civ.8227, 02 Civ.8228, 02 Civ.8229, 02 Civ.8230, 02 Civ.8234, 02 Civ.9513, 02 Civ.9514, 02 Civ.9515, 02 Civ.9516, 02 Civ.9519, 02 Civ.9521, 03 Civ.2841, 03 Civ.3592, 03 Civ.6229.

United States District Court,
S.D. New York.

Sept. 21, 2005.

Max W. Berger, John P. Coffey, Steven B. Singer, Chad Johnson, Beata Gocyk–Farber, Jennifer L. Edlind, John C. Browne, David R. Hassel, Bernstein Litowitz Berger & Grossmann LLP, New York, New York, Leonard Barrack, Gerald J. Rodos, Jeffrey W. Golan, Mark R. Rosen, Jeffrey A. Barrack, Pearlette V. Toussant, Regina M. Calcaterra, Chad A. Carter, Barrack, Rodos & Bacine, Philadelphia, Pennsylvania, for the Lead Plaintiff.

Martin London, Richard A. Rosen, Brad S. Karp, Eric S. Goldstein, Joyce S. Huang, Paul, Weiss, Rifkind, Wharton & Garrison LLP, New York, New York, Peter K. Vigeland, Wilmer, Cutler, Pickering, Hale and Dorr LLP, New York, New York, for the Citigroup Defendants.

Paul C. Curnin, David Elbaum, Helena Almeida, Simpson Thacher & Bartlett

LLP, New York, New York, for the Director Defendants.

John M. Callaghy, Robert I. Steiner, Christine L. Schessler, Kelley, Drye & Warren LLP, New York, New York, for defendant JP Morgan Chase & Co.

Celeste Chiaramonte, Debra Brewer Hayes, Woska & Hayes, L.L.P., Kingwood, Texas, for Roslyn Berger.

David M. Millman, Michael L. Cook, Schulte Roth & Zabel LLP, New York, New York, for the Cerberus Objectors.

Joseph H. Weiss, Weiss & Lurie, New York, New York, for Kenneth D. Laub.

Jeffrey D. Meyer, Moulton & Meyer, L.L.P., Houston, Texas, for Cynthia R. Levin Moulton.

Linda P. Nussbaum, Catherine A. Torrell, Cohen, Milstein, Hausfeld & Toll, P.L.L.C., New York, New York, Steven J. Toll, Joshua S. Devore, Matthew Handley, Washington, D.C., Thomas Earl Patton, Steven C. Tabackman, Brian C. Quinn, Tigue Patton Armstrong Teasdale, PLLC, Washington, D.C., Terry Rose Saunders, Thomas A. Doyle, Saunders & Doyle, Chicago, Illinois, for W. Caffey Norman, III.

Edward S. Feig, Arent Fox PLLCG, New York, New York, Michael J. Maimone, Gordon, Fournaris & Mammarella, P.A., Wilmington, Delaware, Edmond D. Lyons, Jr., The Lyons Law Firm, Wilmington, Delaware, for Richard F. Reynolds.

## OPINION & ORDER

COTE, District Judge.

This Document Relates to: ALL ACTIONS

This Opinion considers the fairness of settlements reached this year in the securities class action litigation arising from the collapse of telecommunications giant WorldCom, Inc. ("WorldCom"). These settlements include the series of settlements between the Lead Plaintiff and the seventeen Underwriter Defendants;[1] and those between the Lead Plaintiff and the twelve Director Defendants,[2] WorldCom's former auditor Arthur Andersen LLP ("Andersen"), former WorldCom CEO Bernard J. Ebbers ("Ebbers"), former WorldCom CFO Scott D. Sullivan ("Sullivan"), and former WorldCom officers Buford Yates ("Yates") and David Myers ("Myers") (collectively, the "2005 Settlements"). The 2005 Settlements total $3.558 billion. Together with the settlement between the Lead Plaintiff and the Citigroup Defendants (the "Citigroup Settlement"), which received final approval on November 14, 2004, the Class will recover $6.133 billion, plus interest.

---

**1.** The seventeen Underwriter Defendants consist of ABN/AMRO Inc. ("ABN Amro"); Banc of America Securities LLC ("BOA"); Blaylock & Partners, L.P. ("Blaylock"); BNP Paribas Securities Corp. ("BNP"); Caboto Holding SIM S.p.a. ("Caboto"); Credit Suisse First Boston Corp. ("CSFB"); Deutsche Bank Securities, Inc. ("Deutsche Bank"), f/k/a Deutsche Bank Alex. Brown, Inc.; Fleet Securities Inc. ("Fleet"); Goldman, Sachs & Co. ("Goldman Sachs"); J.P. Morgan Securities, Ltd. and J.P. Morgan Securities, Inc. (now including Chase Securities Inc.) ("JP Morgan"); Lehman Brothers Inc. ("Lehman Brothers"); Mizuho International plc ("Mizu-

ho"); Mitsubishi Securities International plc ("Mitsubishi"), f/k/a Tokyo–Mitsubishi International plc; UBS Warburg LLC ("UBS"); Utendahl Capital ("Utendahl"); and Westdeutsche Landesbank Girozentrale ("West LB").

**2.** The Director Defendants are James C. Allen, Judith Areen, Carl J. Aycock, Max E. Bobbitt, Clifford L. Alexander, Jr., Francesco Galesi ("Galesi"), Stiles A. Kellett, Jr. ("Kellett"), Gordon S. Macklin, John A. Porter ("Porter"), Bert C. Roberts ("Roberts"), the Estate of John W. Sidgemore, and Lawrence C. Tucker.

Very few Class Members have filed objections to the 2005 Settlements. No one has objected to the amounts of the 2005 Settlements and there is only a single objection to the request for attorneys' fees and expenses submitted by Lead Counsel for the Class.[3] Only a brief, conclusory objection was made to the Plans of Allocation, which determine according to claim type how settlement funds will be distributed. Most of the objections address the scope of the claims release to be imposed pursuant to the 2005 Settlements and the proposed Supplemental Plan of Allocation distributed to the Class with a July 1, 2005 Notice.

With the three modifications to the Supplemental Plan described below, the petition for approval of all of the 2005 Settlements is granted. Lead Counsel's application for attorneys' fees and expenses is also granted.

*Background*

The relevant history of the *Securities Litigation* through November 12, 2004 is described in an Opinion pertaining to the Citigroup Settlement. *See In re World-Com, Inc. Sec. Litig.,* No. 02 Civ. 3288(DLC), 2004 WL 2591402, at *1–*9 (S.D.N.Y. Nov.12, 2004). That description, and the definitions therein, are incorporated by reference into this Opinion.

In brief, WorldCom announced a massive restatement of its financial statements for 2000 and 2001 on June 25, 2002 (the "Restatement"), spurring numerous class actions and other lawsuits.[4] Virtually all federal litigation was transferred to this Court by the Judicial Panel on Multi–Dis-

trict Litigation. The securities class actions were consolidated on August 15, 2002, and the New York State Common Retirement Fund ("NYSCRF") was selected as the Lead Plaintiff. The Lead Plaintiff filed a Consolidated Class Action Complaint on October 11, 2002. The securities class action, scores of actions filed by individual plaintiffs (the "Individual Actions"), many of them large pension funds, and other related securities actions were consolidated on December 23, 2002 for pretrial purposes and are referred to as the *Securities Litigation.*

An Opinion of May 19, 2003 decided various motions to dismiss addressed to the class action complaint. *In re World-Com, Inc. Sec. Litig.,* 294 F.Supp.2d 431 (S.D.N.Y.2003); *see also In re WorldCom, Inc. Sec. Litig.,* No. 02 Civ. 3288(DLC) 2003 WL 21488087 (S.D.N.Y. June 25, 2003) (deciding Andersen's motions to dismiss); *In re WorldCom, Inc. Sec. Litig.,* No. 02 Civ. 3288(DLC), 2003 WL 23174761 (S.D.N.Y. Dec.3, 2003) (deciding motions to dismiss by members of the Audit Committee of WorldCom's board of directors). An Amended Complaint was filed on August 1, 2003; a Corrected Amended Complaint was filed on December 1, 2003.

An Opinion of October 24, 2003 certified a class consisting of all persons and entities who purchased or otherwise acquired publicly traded securities of WorldCom during the period beginning April 29, 1999 through and including June 25, 2002, and who were injured thereby. *See In re WorldCom, Inc., Sec. Litig.,* 219 F.R.D. 267, 274–75 (S.D.N.Y.2003). Putative Class Members received a December 11,

---

**3.** One Class Member filed a timely objection to the requested attorneys' fees, but the objection was later withdrawn. Another individual filed a late objection to the attorneys' fees, but she has provided no evidence to rebut Lead Plaintiff's contention that she is not a Class

Member. The substance of her objection will nevertheless be addressed.

**4.** The litigation even preceded the June 25 announcement: the first securities class action was filed in this district on April 30, 2002.

2003 Notice of Class Action (the "December 2003 Notice"). That notice informed Class Members that they could opt out of the class action by February 20, 2004, a date which was later extended to September 1, 2004.[5] *See WorldCom*, 2004 WL 2591402, at *5.

The $2.575 billion Citigroup Settlement was announced in May 2005. *Id.* Class Members received an August 2, 2004 Notice of the proposed Citigroup Settlement (the "Citigroup Settlement Notice"), which also informed them that the opt-out date had been extended to September 1 and gave them instructions on how to submit proofs of claim. A fairness hearing regarding the Citigroup Settlement was held on November 5, 2004, and that settlement was approved in a November 12, 2004 Opinion. *WorldCom*, 2004 WL 2591402, at *9, *11. The following is an overview of the significant events in the class action litigation since the announcement of the Citigroup Settlement.

*Completion of Discovery*

The Citigroup Defendants settled with the Lead Plaintiff just weeks before the conclusion of fact discovery. A three-week stay was entered to allow the Lead Plaintiff and the Underwriter Defendants an opportunity to determine whether they could also resolve the litigation. The Underwriter Defendants rejected an offer to settle with the Class using the same formula that resolved Securities Act of 1933 ("Securities Act") claims in the Citigroup Settlement (the "Citigroup Formula"). Fact discovery resumed and was concluded on July 9, 2004. During June and July, the Lead Plaintiff took forty-one depositions.

During the late summer and fall, the parties exchanged expert reports and conducted expert discovery. The Lead Plaintiff produced reports from five experts.

*Summary Judgment Opinion Regarding the Underwriter Defendants*

The Underwriter Defendants faced Securities Act Section 11 and Section 12(a)(2) liability stemming from massive bond offerings in 2000 (the "2000 Offering") and 2001 (the "2001 Offering"). They filed motions for partial summary judgment on several grounds, including their reliance defense under Section 11. They argued that they were entitled to rely on WorldCom's audited financial statements and had no duty to investigate their reliability unless they had reasonable grounds to believe that the statements were not accurate. A December 15, 2004 Opinion denied summary judgment on the reliance defense, noting that, while underwriters generally may rely on audited financial statements, a jury could find that one or more "red flags" triggered a duty for the Underwriter Defendants to conduct further investigation of WorldCom's financial status. *See In re WorldCom Sec. Litig.*, 346 F.Supp.2d 628, 678–81 (S.D.N.Y.2004). The Opinion also ruled that the Underwriter Defendants were not entitled to summary judgment because of their receipt of Andersen's comfort letters for the unaudited quarterly financial statements incorporated into the Registration Statements for the 2000 and 2001 Offerings. Rather, although the comfort letters were one factor a jury could consider, the Underwriter Defendants still had to establish that they had performed a reasonable investigation regarding any unaudited financials in or-

---

**5.** Prior to February 20, approximately 6,400 investors opted out of the Class; in total, approximately 14,220 investors opted out. Counsel in the class action attribute the number of opt-outs to the aggressive solicitation of Class Members by attorneys, but Lead Counsel nonetheless characterizes the number of opt-outs as "small" given the large number of WorldCom investors.

der to establish their due diligence defense under Section 11. *See id.* at 681–85.

The Lead Plaintiff filed its own motion for partial summary judgment against the Underwriter Defendants. It succeeded on the issue of whether the Registration Statement for the 2001 Offering was false and misleading, but was denied summary judgment in regard to the 2000 Offering. *Id.* at 661.

*Initial Settlement with the Director Defendants*

Following settlement discussions spanning more than twenty months, the Lead Plaintiff and ten of the twelve Director Defendants executed a Memorandum of Agreement in May 2004. In the following months, the Lead Plaintiff reviewed detailed financial information provided by those ten directors, and the negotiations between the directors and several insurers that had issued excess directors and officers insurance policies to WorldCom (the "Excess Insurers") continued.[6] On January 6, 2005, a settlement was reached between the Lead Plaintiff, the ten Director Defendants, and the Excess Insurers. The settlement was for a total of $54 million; notably, the settlement amount included $18 million paid personally by the settling Director Defendants, representing more than twenty percent of those individuals' cumulative net worth, excluding their primary residences, retirement accounts, and certain joint marital property.[7] The balance of the settlement amount, $36 million, represented the Excess Insurers' contribution.

Portions of the January 6 settlement agreement that were conditioned on the Court's staying the lawsuit brought by Roberts, a non-settling Director Defendant, against the Excess Insurers and deferring a decision on Roberts' application for an order to advance defense costs were rejected by the Court in a conference on January 11.[8] The parties to the settlement submitted a revised Stipulation of Settlement that omitted those provisions on January 18 (the "January 18 Stipulation").

The January 18 Stipulation retained a provision known as a judgment reduction formula (the "Judgment Reduction Formula") that provided, in essence, that any damages awarded against non-settling defendants would be reduced by the greater of the settlement amount or the proportionate liability of the settling Director Defendants, as found at trial, adjusted to reflect any limitation on the financial capability of the settling Director Defendants to pay. The settlement was conditioned on approval of the Judgment Reduction Formula, which paralleled a formula that had received the Court's approval in the WorldCom *ERISA Litigation. See In re WorldCom, Inc. ERISA Litig.,* 339 F.Supp.2d 561, 571 (S.D.N.Y.2004). Several non-settling defendants objected to the portion of the Judgment Reduction Formula that took into account settling Di-

---

**6.** The Excess Insurers had taken the position that the policies they had issued were null and void.

**7.** The Court makes no judgment as to the wisdom of making personal monetary contributions by outside directors a condition of settlement. Commentators have noted that this tactic may "trouble some executives so much that they may think twice about serving on boards," Joann S. Lublin et al., *Directors Are Getting the Jitters: Recent Settlements Tap-*

*ping Executives' Personal Assets Put Boardrooms on Edge,* Wall St. J., Jan. 13, 2005, at B1, a development that would not bode well for shareholders in the long run.

**8.** An Opinion mandating that the Excess Insurers advance Roberts' defense costs was issued on February 3, 2005. *In re WorldCom, Inc. Sec. Litig.,* 354 F.Supp.2d 455 (S.D.N.Y. 2005).

rector Defendants' ability to pay, arguing that it violated 15 U.S.C. § 78u–4(f)(7)(B)(I), the applicable provision of the Private Securities Litigation Reform Act of 1995 ("PSLRA").

In an Order of February 2, the Court ruled that the Judgment Reduction Formula in the January 18 Stipulation was impermissible under the PSLRA. An Opinion of February 10 explained this ruling in detail; a Corrected Opinion was issued soon thereafter. *In re WorldCom, Inc. Sec. Litig.*, No. 02 Civ. 3288(DLC), 2005 WL 335201 (S.D.N.Y. Feb.14, 2005). That Opinion lamented the fact that the applicable PSLRA provision rendered it highly unlikely that plaintiffs bringing Securities Act claims would be willing to settle with outside directors before reaching settlements with "deep pockets" such as underwriters. *See id.* at *14–*15. This policy concern was well-founded. Soon after the Judgment Reduction Formula ruling was announced, the Lead Plaintiff exercised its right to withdraw from the settlement. The Director Defendants were given until February 25 to file a pretrial order for the rapidly approaching trial, which was then scheduled to begin on February 28, 2005.

*Summary Judgment Opinion Regarding Andersen*

Andersen, which was facing claims under Securities Act Section 11 and Securities Exchange Act of 1934 ("Exchange Act") Section 10(b), filed a motion for partial summary judgment on August 23, 2004. It argued that Lead Plaintiff had failed to present sufficient evidence that the 1999 WorldCom financial statements audited by Andersen contained a material misstatement. In addition, Andersen contended that there was no evidence of scienter sufficient to support a finding under Section 10(b) that Andersen certified the 1999, 2000, and 2001 WorldCom financial statements recklessly or with knowledge that material misstatements or omissions were present.

A January 18, 2005 Opinion denied summary judgment for Andersen. It ruled that whether various accounting treatments, including WorldCom's use of purchase method accounting for its 1998 acquisition of MCI, Inc. ("MCI") and its assignment of a forty-year lifespan to the MCI goodwill, complied with Generally Accepted Accounting Principles (GAAP) and thus did not constitute misstatements, were issues of fact for a jury to decide, precluding summary judgment on the 1999 financials. *See In re WorldCom, Inc. Sec. Litig.*, 352 F.Supp.2d 472, 493–94 (S.D.N.Y.2005). That Opinion also ruled that issues of fact existed regarding whether Andersen's audits of WorldCom financials were so deeply flawed that Andersen acted with reckless disregard and whether certain "red flags" should have prompted Andersen to reevaluate its audit plans. *See id.* at 497–98.

*Motions in Limine*

On January 7, 2005, motions *in limine* and the Joint Pretrial Order were filed by the Lead Plaintiff and various non-settling defendants. The Lead Plaintiff filed six motions *in limine*; the Underwriter Defendants filed eleven, as well as a motion to phase the trial; Andersen filed eight; Director Defendant Galesi filed thirty. On February 8, an Order was issued denying the Underwriter Defendants' motion to phase the trial and providing preliminary rulings on most of the Lead Plaintiff's and Underwriter Defendants' motions. Full Opinions regarding most of the pending motions *in limine* were issued on February 17. *See In re WorldCom, Inc. Sec. Litig.*, No. 02 Civ. 3288(DLC) 2005 WL 375315 (S.D.N.Y. Feb.17, 2005) (Lead Plaintiff's motions *in limine* and Underwriter Defendants' motion to phase the

trial); *In re WorldCom, Inc. Sec. Litig.*, No. 02 Civ. 3288(DLC) 2005 WL 375314 (S.D.N.Y. Feb.17, 2005) (Underwriter Defendants); *In re WorldCom, Inc. Sec. Litig.*, No. 02 Civ. 3288(DLC) 2005 WL 375313 (S.D.N.Y. Feb.17, 2005) (Andersen). Several pending motions were further addressed at pretrial conferences and in later Opinions. Motions *in limine* by Galesi were addressed on March 4, *In re WorldCom, Inc. Sec. Litig.*, No. 02 Civ. 3288(DLC) 2005 WL 517333 (S.D.N.Y. Mar.4, 2005), and those brought by other Director Defendants were decided in a Memorandum Opinion of March 16, 2005.

Significant motions *in limine* included that of the Lead Plaintiff to exclude evidence from the plenary trial relating to individualized issues of the class representatives. The Lead Plaintiff's motion was granted in an Opinion of February 22. *See In re WorldCom, Inc. Sec. Litig.*, No. 02 Civ. 3288(DLC), 2005 WL 408137 (S.D.N.Y. Feb.22, 2005). Motions brought by both the Underwriter Defendants and Andersen to preclude Lead Plaintiff's expert from presenting an aggregate damages calculation to the jury were denied. *See WorldCom*, 2005 WL 375314, at *7–*8; *WorldCom*, 2005 WL 375313, at *2–*5; *In re WorldCom, Inc. Sec. Litig.*, No. 02 Civ. 3288(DLC), 2005 WL 491397 (S.D.N.Y. Mar.3, 2005). Andersen filed a motion to exclude evidence of the Restatement, arguing, *inter alia*, that the Restatement was irrelevant and based on hearsay. Andersen's motion was denied on the basis that the Restatement was clearly relevant to, and in fact highly probative of, the issues being tried. The Restatement was ruled an admissible business record under Rule 803(6), Fed.R.Evid. *See WorldCom*, 2005 WL 375313, at *6–*9.

Andersen also moved to preclude evidence of corporate wrongdoing, including evidence of its indictment in connection with its role as Enron's auditor and evidence of other litigation in which Andersen had been involved. An Opinion of March 4 ruled that references to most other litigation against Andersen would be barred, but that decision would be deferred on references to Enron, as the Lead Plaintiff had pointed to evidence that the Enron scandal directly affected certain decisions made by WorldCom's management in regard to Andersen. *See In re WorldCom, Inc. Sec. Litig.*, No. 02 Civ. 3288(DLC), 2005 WL 578109, at *1–*2 (S.D.N.Y. Mar.4, 2005). That Opinion also deferred a ruling on the Underwriter Defendants' motion to bar evidence of the spinning of "hot" IPO shares by Salomon Smith Barney ("SSB"), a co-lead underwriter in the 2000 and 2001 Offerings and one of the Citigroup Defendants. *See id.* at *2–*4.

*Extension of Trial Date*

In October 2004, in light of a two-month delay in the date of Ebbers' criminal trial, the class action trial date was moved from January 10, 2005 to February 28, 2005. In a pretrial conference of February 18, 2005, the trial was rescheduled for March 17, 2005. The delay was attributable to the Government's reluctance to allow several "embargoed" witnesses who were testifying in Ebbers' criminal trial to submit to depositions by counsel for parties to the class action until the evidentiary portion of the criminal trial had concluded. *See WorldCom*, 2004 WL 2591402, at *4.

*Underwriters' Settlements*

In early February 2005, the Lead Plaintiff commenced settlement negotiations with BOA and several junior underwriters who had participated in the 2000 Offering only, and after those proved successful, opened negotiations with the remaining Underwriter Defendants. The seventeen Underwriter Defendants had coordinated their litigation strategy; as trial approached, however, they procured separate

settlement counsel and broke rank.[9] In the period from March 3 through March 16, 2005, settlements totaling $3,427,306,840 were achieved between the Lead Plaintiff and each of the Underwriter Defendants (the "Underwriters' Settlements").

On March 3, the Lead Plaintiff informed the Court that it had reached a settlement with BOA and Fleet, two Underwriter Defendants that had combined after their participation in the 2000 and 2001 Offerings, for a total of $460.5 million (the "BOA Settlement"). Of this amount, 13.61% has been allocated to Class Members who purchased bonds in the 2000 Offering ("2000 Purchasers"), and 86.39% to those who purchased bonds in the 2001 Offering ("2001 Purchasers"). The Plan of Allocation for the BOA Settlement and each of the subsequent settlements is based on the number of bonds the Underwriter Defendant was allocated in each Offering, as well as the Securities Act Section 11 damages provision, 15 U.S.C. § 77k(e). The BOA Settlement amount was calculated using the Citigroup Formula. As already noted, all Underwriter Defendants had been offered the opportunity to settle at the Citigroup Formula rate in May 2004, at the time the Citigroup Settlement was announced.

On March 4, four more settlements were announced (the "March 4 Settlements"): Lehman Bros. settled for $62,713,582, and CSFB, Goldman Sachs, and UBS Warburg each agreed to pay $12,542,716. Those defendants participated only in the 2000 Offering, so all recovery from the March 4 Settlements will go to 2000 Purchasers. The March 4 Settlements likewise followed the Citigroup Formula. With two minor exceptions, all of the settlements with the Underwriter De-

fendants that followed included a premium over the Citigroup Formula. The Lead Plaintiff reached settlements with four more Underwriter Defendants on March 9 (the "March 9 Settlements"): ABN AMRO agreed to pay $278,365,600; Mitsubishi agreed to pay $75 million; and BNP and Mizuho settled for $37.5 million each. On March 10, Deutsche Bank settled for $325 million; Caboto settled for $37.5 million; and WestLB agreed to pay $75 million (the "March 10 Settlements"). With the exception of Deutsche Bank, all defendants involved in the March 9 and March 10 Settlements participated only in the May 2001 Offering; recovery from those settlements will thus go only to 2001 Purchasers. Of the Deutsche Bank settlement monies, 4.15% is to be distributed to 2000 Purchasers, and 95.85% to 2001 Purchasers.

A conference was held on March 9 to address preliminary approval of the BOA Settlement and the March 4 Settlements. Preliminary approval was delayed, however, until the Court could address objections by JP Morgan to the Judgment Reduction Formula and Bar Order in the BOA Settlement. JP Morgan was a co-lead underwriter with SSB in both the 2000 and 2001 Offerings. A March 15 Opinion rejected JP Morgan's objections. *In re WorldCom, Inc. Sec. Litig.*, No. 02 Civ. 3288(DLC), 2005 WL 613107 (S.D.N.Y. Mar.15, 2005). That Opinion performed a theoretical but detailed calculation of the damages faced by JP Morgan should it proceed to trial. *See id.* at *7. All settlements that had been announced through March 10 received preliminary approval in a March 16 conference.

On March 16, JP Morgan settled for $2 billion. This was $630 million more than

9. SSB, which was also a lead underwriter for both Offerings, was separately represented and had settled with the Lead Plaintiff as part of the Citigroup Settlement.

the Lead Plaintiff had been willing to accept in settlement in May 2004, at the time of the Citigroup Settlement, and thus represents a significant premium over the Citigroup Formula. Of the $2 billion sum, 22.75% will go to 2000 Purchasers, and 77.25% to 2001 Purchasers. The same day, Blaylock and Utendahl agreed to pay $572,840 and $234,000, respectively.[10] The amount recovered from Utendahl will go entirely to 2001 Purchasers, while 43.02% of the Blaylock monies will be distributed to 2000 Purchasers and 56.98% to 2001 Purchasers. The final three settlements received preliminary approval in a March 18 conference.

Because the Underwriter Defendants faced only Securities Act claims stemming from the 2000 and 2001 Offerings, the amounts recovered in the Underwriters' Settlements are allocated solely to those claims.[11] Thus, the recovery will go to Class Members who purchased bonds in the 2000 and 2001 Offerings, not to purchasers of WorldCom stock or bonds issued prior to those Offerings. The Underwriters' Settlements, and almost all settlements in the class action litigation, were achieved with significant involvement by the Honorable Robert W. Sweet, U.S. District Judge for the Southern District of New York, and the Honorable Michael H. Dolinger, U.S. Magistrate Judge of the Southern District of New York.

*Severance of the Claims Against Ebbers, Sullivan, Myers, and Yates*

An Order of March 16, 2005 severed the claims against defendants Ebbers, Sullivan, Myers, and Yates pursuant to Rule 21, Fed.R.Civ.P.[12] Severance was granted in light of the criminal prosecution of those four defendants; the class action litigation against them had previously been stayed for the same reason. In addition, the Order deemed that any testimony given by the four severed defendants at Ebbers' criminal trial would be admissible in the class action trial. No party to the class action litigation had objected to this accommodation.

*Director Defendants' Settlement*

After the Underwriter Defendants had settled with the Lead Plaintiff, the Director Defendants and Excess Insurers were able to resurrect their settlement agreement (the "Directors' Settlement"). On March 16, the Court was informed that a settlement with the Director Defendants was imminent; a Stipulation of Settlement was executed on March 18, 2005. Former directors Galesi and Roberts, neither of whom had been a party to the original Director Defendants' settlement, joined the settlement—Galesi in the first instance, and Roberts on March 21. Roberts' personal contribution was $4.5 million, which Lead Counsel represents to be significantly more than twenty percent of Roberts' personal net worth, thus representing a premium over what was obtained from the other directors.

The total amount of the Directors' Settlement is $60.75 million. Of that amount, $24.75 million was paid by the Director Defendants personally, and $36 million was contributed by the Excess Insurers. With a prior payment of $15 million, this contribution is approximately one-half of the available insurance proceeds. Unlike the January 18 Stipulation to which ten of the

---

**10.** The Blaylock and Utendahl Settlements were below the Citigroup Formula.

**11.** Some of the Underwriter Defendants participated in only one of the two bond offerings at issue in the case, and, as already noted,

proceeds from those settlements are allocated accordingly.

**12.** The same Order severed the claims against Porter, one of the Director Defendants, because he had filed for bankruptcy.

twelve Director Defendants were parties, the March 21 Stipulation contains a Judgment Reduction Formula that conforms to the PSLRA. The Directors' Settlement was granted preliminary approval on March 21, 2005.

The Plan of Allocation for the Directors' Settlement provides that 80% of the funds are to be allocated to purchasers of World-Com stock and other publicly traded debt securities. The remaining 20% will be distributed to purchasers of bonds in the 2000 and 2001 Offerings. Of this amount, 4.774% will go to purchasers in the 2000 Offering, and 15.226% to purchasers in the 2001 Offering. The Directors' Settlement also reserved other funds from the Excess Insurers for the Director Defendants' defense of the claims pending against them in the various Individual Actions.

*Summary Judgment Opinion Regarding Roberts*

Roberts, chairman of the WorldCom board of directors throughout the Class Period and one of the Director Defendants, had also filed a summary judgment motion. Roberts argued that he had established his due diligence defense under Securities Act Section 11; that he was not a "controlling person" under Exchange Act Section 20(a); and that he had established his affirmative defenses under Section 20(a) and Securities Act Section 15. In an Opinion of March 21, 2005, which was issued hours before Roberts agreed to join the Directors' Settlement, Roberts' summary judgment motion was denied on all counts. *See In re WorldCom, Inc. Sec. Litig.,* No. 02 Civ. 3288(DLC), 2005 WL 638268 (S.D.N.Y. Mar.21, 2005).

*Andersen Trial and Settlement*

Jury selection in the class action trial against Andersen, the only remaining defendant against which the litigation had not been severed, began on March 23, 2005.[13] Individualized voir dire was conducted on March 28, and opening statements began the following morning. The Lead Plaintiff presented eleven fact witnesses, three of whom testified live at trial, and four expert witnesses. Andersen presented a number of fact witnesses, including two Andersen audit and engagement partners, and one expert witness. Only two more experts were set to testify on Andersen's behalf when the jury was dismissed because the Lead Plaintiff and Andersen had reached a settlement.[14] The jury was remarkably attentive throughout the proceedings.

The testimony from three of the Lead Plaintiff's witnesses was particularly memorable. Richard Roscitt, the former president of AT & T Business Services from December 1999 to January 2001, described his amazement at WorldCom's E/R ratio as reported in its quarterly and annual financial statements, and the concerted efforts he and his team made over a period of months to try to understand why World-Com's reported performance of such a critical indicator was so superior to AT & T's

---

**13.** In a conference on March 16, 2005, the trial date was further delayed for approximately a week pending preliminary approval of the Directors' Settlement and several of the Underwriters' Settlements. On March 23, members of the venire completed a brief questionnaire addressed to questions such as any burden imposed by the anticipated length of the trial and ownership of WorldCom or MCI securities.

**14.** Time limits of fifty hours apiece had been imposed on the Class and Andersen for opening statements and presentation of evidence (whether through direct or cross-examination). When the trial ended, the Class was set to use every minute of that time; Andersen was expected to complete its presentation of evidence with hours of its allotted time to spare.

comparable ratio.[15] The Lead Plaintiff offered this testimony, a videotaped deposition which had been noticed by underwriter defendants in an Individual Action, to establish that a "red flag" existed which put Andersen on notice that WorldCom might not be accurately recording its line costs, which were its largest operating expense. If the E/R ratio constituted a red flag, it required Andersen to conduct a reasonable audit of the WorldCom records associated with the reporting of its E/R ratio. The Lead Plaintiff also offered the evidence to show that Andersen had acted in willful blindness to WorldCom's financial condition and in abrogation of its duty as an auditor, rendering it liable under Exchange Act Section 10(b).

Eugene Morse ("Morse"), who worked in WorldCom's Internal Audit department, was the single most important individual in the discovery of the scheme at WorldCom to capitalize line costs in order to improve WorldCom's reported revenue and E/R ratio. WorldCom's Internal Audit department did not perform financial audits until early 2002. In May 2002, Morse noticed a discrepancy of well over $1 billion between the numbers reflected in the capital expenditures report he was reviewing and WorldCom's publicly reported numbers. The executive director of the capital budget attributed the discrepancy to "prepaid capacity." Morse searched for the source of the so-called prepaid capacity using a computer software called Essbase that allows one to navigate the company's general ledger, and quickly found a series of entries of large round-number entries such as $500 million. After further investigation, often performed alone at night in WorldCom's offices, he found that the amounts were transfers originating from line costs. Line costs were the company's largest operating expense and therefore not an item that should be capitalized. The suspicious entries were made after the closing of the quarters they affected and directly preceded the dates on which WorldCom issued press releases announcing its financial results. Morse found $1.7 billion of fraud in the first few days of his investigation, and a total of $3 billion, dating as far back as the first quarter of 2001, within a couple of weeks. Cynthia Cooper, the head of the Internal Audit department, encouraged Morse throughout his investigation and reported the findings to the audit committee of WorldCom's board of directors on June 20, 2002. The fraud at WorldCom was disclosed to the public several days later.

Finally, Ralph Stark testified as one of the Lead Plaintiff's experts. In December 2004, the Lead Plaintiff obtained access to WorldCom's computerized general ledger for the year 2001.[16] In just half an hour, using a protocol to examine using Essbase the largest categories in WorldCom's balance sheet and income statement for any large, post-closing adjustments, Stark and his team found the first "unusual" journal entry, or financial input, in WorldCom's general ledger. Within hours, he found many large, round-number, post-closing

---

**15.** A discussion of WorldCom's reported E/R ratio and why it raised an issue of fact as to whether it constituted a "red flag" that imposed on the Underwriter Defendants a duty to investigate the reliability of these figures in WorldCom's audited financial statements is contained in the Opinion addressing the Underwriter Defendants' summary judgment motion. *See WorldCom,* 346 F.Supp.2d at 678–80.

**16.** MCI, the successor to WorldCom, granted experts from Lead Plaintiff and Andersen access to the WorldCom general ledger for the year 2001. Andersen had initiated the request for this access but did not seek to offer at trial any testimony about its expert's examination of the general ledger.

entries. Stark testified that a junior financial analyst, accountant, or auditor with basic training in Essbase could have readily discovered the same entries in an audit of the general ledger. The Lead Plaintiff offered this evidence to illustrate how easily Andersen could have discovered the WorldCom fraud if it had audited WorldCom's general ledger for post-closing adjustments. The Lead Plaintiff's examination at trial of Andersen's auditors showed that Andersen's audit planning had identified post-closing adjustments to the general ledger as one of the ways in which WorldCom could commit fraud, but that Andersen did not access the computerized general ledger to perform such an audit during the years in question.

At the end of two weeks of trial testimony, the Court asked the parties to renew their settlement negotiations. The next week Andersen shared information regarding its financial condition with the Lead Plaintiff for the first time. On April 22, 2005, at the end of the fourth week of trial and a few short days before closing arguments, the Lead Plaintiff and Andersen reached a settlement (the "Andersen Settlement"). In an April 22 Stipulation of Settlement, Andersen agreed to pay $65 million in cash, plus contingent payments equivalent to 20% of any amount paid out by Andersen to present or former partners and certain other individuals in repayment of any subordinated notes issued in respect of paid-in capital or subordinated loans. The Stipulation of Settlement also contained a "most favored nation clause" entitling the Class to receive an additional amount if Andersen pays from its own funds more than $65 million in any other settlement.

On April 26, preliminary approval of the Andersen Settlement was granted, the money was transferred to Lead Plaintiff's escrow account, and the jury was dismissed. The Plan of Allocation for the Andersen Settlement distributes the settlement funds between Exchange Act and Securities Act claims in the same proportion as the Directors' Settlement Plan of Allocation. Because the first alleged misstatement by Andersen was made on March 30, 2000, however, Exchange Act monies will only be allocated to Class Members who purchased WorldCom securities on or after that date. Judge Sweet and Magistrate Judge Dolinger released an April 22, 2005 Mediators' Statement attesting that, based on the information available to them and their discussions with the parties, "this Settlement was negotiated in good faith, and ... the Settlement and the allocation between the Securities Act and Exchange Act claims are in the public interest."

*Notice to the Class*

A Hearing Order of June 14, 2005 (the "Hearing Order") established the schedule for final approval of the settlements with the Underwriter Defendants, the Director Defendants, and Andersen, and approved a Summary Notice of Class Settlements ("Summary Notice"); a Summary of Supplemental Plan of Allocation ("Summary Supplemental Plan"); and a full-length Notice of Settlements of Class Action ("Class Notice"), which included the proposed Supplemental Plan of Allocation (the "Supplemental Plan"). It also extended the deadline by which Class Members could file proofs of claim from March 4, 2005 to August 26, 2005. The Hearing Order required the Lead Plaintiff to begin mailing the Class Notice (with the Supplemental Plan) by July 1, 2005 to those members of the Class who had already filed a proof of claim. Beginning on June 28, the mailings of these documents were made to over 800,000 Class Members who had filed proofs of claim. The Class Notice and Summary Supplemental Plan

were mailed at the same time to approximately 3.5 million other potential Class Members.[17] Summary Notices were published in the *Wall Street Journal* and the *New York Times* and over the PR Newswire and Bloomberg News in early July.

The Class Notice presented the definition of the Class, which encompasses "[a]ll persons or entities who purchased or acquired publicly traded securities of World-Com ... during the period from April 29, 1999 through and including June 25, 2002, and who were injured thereby" (the "Class Definition"). It gave a detailed Statement of Potential Outcome, which described the issues confronting the parties and the various risks involved in prosecuting the class claims against the settling defendants, and recounted the history of the litigation. It set forth the language of the Release to be imposed pursuant to the settlements and defined the Settling Defendant Releasees. Released Claims are defined as

> *all claims and causes of action of every nature* and description, known and unknown, whether under federal, state, common, or foreign law, whether brought directly or derivatively, *based upon,* arising out of, or relating in any way to *investments* (including, but not limited to, purchases, sales, exercises, and decisions to hold) *in securities issued by WorldCom,* including without limitation all claims arising out of or relating to any disclosures, public filings, registration statements or other state-

ments by WorldCom, as well as all claims asserted by or that could have been asserted by Plaintiffs or any member of the Class in the Action against the Settling Defendant Releasees.[18]

(Emphasis supplied.)

The Class Notice outlined the Underwriters', Directors', and Andersen Settlements, listing settlement dates and dollar amounts and setting forth the Plans of Allocation. It also specified the maximum amount of attorneys' fees and costs that Lead Counsel would seek. It set a deadline of August 12, 2005 for any objections to the settlements and announced a September 9, 2005 fairness hearing (the "Fairness Hearing"). The Class Notice informed Class Members that they would receive no further mailing if settlements were reached with Ebbers, Sullivan, Myers, and/or Yates unless they submitted a request to the Claims Administrator for written notice of any additional settlements. Rather, notice of further settlements would be provided on www.worldcomlitigation.com, the website maintained by Lead Counsel ("Lead Counsel Website"), and in several specified publications. This method of notice was approved in light of the fact that any settlement with the remaining defendants would not materially increase recovery for the Class, whereas another mailed notice would constitute a significant expenditure.[19]

The Supplemental Plan specifies the methodology for calculating a "Recognized

---

17. The Summary Supplemental Plan ran two pages, while the Supplemental Plan itself was eighty-five pages long.

18. The Release also states that Class Members are not precluded from claiming with respect to funds made available from the WorldCom bankruptcy or WorldCom's settlement with the Securities and Exchange Commission ("SEC") or any other regulatory agency fund.

19. The expense associated with providing notice to every member of the WorldCom class can be gleaned from these figures, which reflect only some of the costs of notice. The cost of disseminating the July 1, 2005 Class Notice and Supplemental Plan to 600,000 Class Members was $588,000; the cost of disseminating the Class Notice and Summary Supplemental Plan to approximately 3.5 million other potential class members was $2,360,000.

Amount" for each Class Member's losses, based on the type of security purchased and the date it was sold or redeemed. It also specifies that there will be no recovery for WorldCom securities sold or redeemed on or before January 28, 2002, explaining that the first decline in the price of WorldCom securities that could be said to be caused by WorldCom's misrepresentation of its financial condition was a decline on or after January 29, 2002.[20] The tables accompanying the Supplemental Plan lay out the dollar amount of artificial inflation inhering in the market price of each type of WorldCom security for each day of the Class Period, as estimated by the Lead Plaintiff.

*Ebbers Settlement*

The Lead Plaintiff reached a settlement with Ebbers on July 6, 2005 (the "Ebbers Settlement"). The settlement results in the surrender of substantially all of Ebbers' assets. Pursuant to the Ebbers Settlement, the Class will receive $5,636,543.69 in cash. The Class is also entitled to approximately 75% of the net proceeds from the sale of various assets held by Ebbers, including a house, several plots of land, certain farm equipment, and interests in various businesses, and will receive approximately two-thirds of the net proceeds from the sale of the Joshua Timberlands, another Ebbers asset. The balance of the proceeds from the sale of Ebbers' assets will go to settle debts Ebbers owes to MCI. The Lead Plaintiff estimates that the sale of Ebbers' assets will result in an additional $18 million to $28 million of recovery for the Class. The Ebbers Settlement also includes a Confidential Supplemental Stipulation allowing Ebbers to retain a specified amount to pay legal bills, to fund his defense in other

litigation, and to pay $450,000 owed on a note to the class plaintiffs in the World-Com *ERISA Litigation.* The Plan of Allocation for the Ebbers Settlement is identical to those proposed for the Directors' and Andersen Settlements. Lead Counsel have chosen not to apply for any additional attorneys' fees on the basis of the Ebbers Settlement. A hearing regarding preliminary approval of the Ebbers Settlement was held on July 11, and a Preliminary Approval Order was issued on the same date.

Ebbers was indicted on criminal charges for his involvement in the WorldCom fraud on March 2, 2004; a jury convicted him of nine felony counts on March 15, 2005, after a trial before the Honorable Barbara S. Jones, U.S. District Judge for the Southern District of New York. In recognition of the Ebbers Settlement, the Office of the U.S. Attorney for the Southern District of New York ("U.S. Attorney's Office") agreed not to seek further monetary restitution from Ebbers. In addition, the New York State Attorney General agreed to dismiss certain claims against Ebbers that were pending in a New York state court. On July 13, Judge Jones sentenced Ebbers to twenty-five years in prison.

*Myers, Yates, and Sullivan Settlements*

On July 21, 2005, the Lead Plaintiff reached a settlement agreement with Myers and Yates (the "Myers–Yates Settlement"), embodied in a Stipulation of Settlement of July 26. It does not require either Myers or Yates to pay money to the Class, as the Lead Plaintiff determined that both defendants lack adequate financial resources and that the expense of further prosecution of the claims against

---

**20.** The Lead Plaintiff has proposed that this provision be altered to allow a small recovery for Class Members who sold their securities on or before January 28, 2002. This proposed modification to the Supplemental Plan is discussed in detail below.

those defendants would thus be detrimental to the Class.

A settlement with Sullivan was announced on July 25, 2005 (the "Sullivan Settlement"). As was true for the Ebbers Settlement, the Sullivan Settlement results in the surrender of substantially all of Sullivan's assets. Pursuant to the terms of the Stipulation of Settlement with Sullivan, dated July 26, 2005, the Class will receive 90% of Sullivan's MCI 401(k) account, representing approximately $200,000. It will also receive approximately 90% of the net proceeds from the sale of a Boca Raton, Florida house owned by Sullivan. Five percent of the proceeds of the sale of the Boca Raton house will be held in escrow by Sullivan's attorneys to fund his defense in other litigation, including the WorldCom Individual Actions. The balance of the proceeds from the 401(k) and the sale of the house will be distributed to the plaintiff class in the WorldCom *ERISA Litigation.* The sale of the Florida house is expected to result in a net payment of between $4 and $5 million to the Class.

The Plan of Allocation for the Sullivan Settlement is identical to those for the Directors' Settlement, Andersen, and Ebbers Settlements. As with the Ebbers Settlement, Lead Counsel chose to forego any request for attorneys' fees based on the Sullivan Settlement. Preliminary approval was given to the Sullivan and Myers–Yates Settlements in a hearing on July 28.

Sullivan, Myers, and Yates had all pleaded guilty to criminal charges pending against them. In light of the Sullivan Settlement, the U.S. Attorney's Office did not seek further monetary restitution from him. On August 9, Judge Jones sentenced Yates to a year and a day in prison, and the following day, Myers received a one-year sentence. On August 11, Sullivan was sentenced to five years in prison. Yates', Myers', and Sullivan's sentences were significantly reduced because they had cooperated with the Government in its prosecution of Ebbers.

*Notice to the Class of the Ebbers, Myers–Yates, and Sullivan Settlements*

As provided in the Hearing Order, no notice of the Ebbers, Myers–Yates, and Sullivan Settlements (collectively, the "Officers' Settlements") was mailed to the Class. A Notice of Proposed Settlements of Class Action ("Officers' Settlement Notice") appeared through the channels prescribed by the Hearing Order. That document once again set forth the definition of the Class, described the Officers' Settlements and the corresponding Plans of Allocation by claim, announced that the Officers' Settlements would be considered at the previously scheduled September 9, 2005 Fairness Hearing, and informed Class Members of the sources from which they could receive previous Notices and proof of claim forms. As of the very end of August, only eighteen class members had contacted the Claims Administrator to request that a copy of the Officers' Settlement Notice be mailed to them directly.

*Reaction of the Class to the 2005 Settlements*

Over four million putative Class Members were sent notice of the 2005 Settlements. Approximately 834,000 Class Members ultimately filed proofs of claim.[21] Despite the significant participation of the Class in the claims process, only seven Class Members—a minuscule percentage—filed timely objections to the 2005

---

**21.** Approximately 535,000 Class Members had submitted proofs of claim by March 4, 2005, the original deadline.

Settlements. Notably, the objectors did not attack the amounts obtained in the settlements; by and large, their objections addressed the scope of the Release and the provisions of the Supplemental Plan. The objectors are Roslyn Berger ("Berger"), who objects to the scope of the Release; Cerberus Partners, L.P., Cerberus International Ltd., Cerberus Institutional Partners, L.P.—Series Two, and Cerberus Institutional Partners America, L.P. (the "Cerberus Objectors"), who object to four aspects of the Supplemental Plan; Kenneth D. Laub ("Laub"), who objects to the Supplemental Plan;[22] Cynthia R. Levin Moulton ("Moulton"), who objects to the Class Notice, the scope of the Release, and the Plans of Allocation; W. Caffey Norman, III, who objects to the Supplemental Plan; Richard F. Reynolds ("Reynolds"), who objects to the scope of the Release; and Charles Lee Thomason ("Thomason"), who objects to the format of the Proof of Claim Form.[23] Their objections are discussed in detail below.

*Fairness Hearing*

The Fairness Hearing was held on September 9, 2005. Lead Counsel and counsel for additional Named Plaintiffs Fresno County Employees Retirement Association; the County of Fresno, California; and HGK Asset Management, Inc. appeared at the hearing, as did Alan P. Lebowitz, General Counsel for the Comptroller of the State of New York, representing the NYSCRF; and Liaison Counsel for the Individual Actions. Also present were counsel for various Underwriter Defen-

dants, the Citigroup Defendants, Andersen, various Director Defendants, and Ebbers. The Cerberus Objectors, Laub, Moulton, Norman, and Reynolds were also represented by counsel at the Fairness Hearing; these objectors were all given the opportunity to be heard.

*Discussion*

*Judicial Approval of Class Action Settlements Under Rule 23(e)*

Pursuant to Rule 23(e), Fed.R.Civ.P., any settlement of a class action must be approved by the court. The following discussion of the requirements of Rule 23(e) draws heavily from an October 18, 2004 Opinion approving a settlement in the WorldCom *ERISA Litigation, see In re WorldCom ERISA Litig.,* No. 02 Civ. 4816(DLC), 2004 WL 2338151, at *5–*6 (S.D.N.Y. Oct.18, 2004), and from the November 12 Opinion approving the Citigroup Settlement, *see WorldCom,* 2004 WL 2591402, at *10.

■ In determining whether to approve a class action settlement, the district court must "carefully scrutinize the settlement to ensure its fairness, adequacy and reasonableness, and that it was not a product of collusion." *D'Amato v. Deutsche Bank,* 236 F.3d 78, 85 (2d Cir.2001) (citation omitted); *see also Joel A. v. Giuliani,* 218 F.3d 132, 138 (2d Cir.2000). In so doing, the court must "eschew any rubber stamp approval" yet simultaneously "stop short of the detailed and thorough investigation that it would undertake if it were actually

---

**22.** Although they did not file objections, several Class Members, Dennis G. Baxter, Larry Kolko, and Tom Roberts, submitted correspondence to the Court and/or to Lead Counsel voicing a similar objection to those briefed by Laub: namely, that the allocation of settlement funds only to those Class Members who sold or held their WorldCom securities on or after January 29, 2002 is unfair. The fairness

of that allocation is discussed below with respect to the Laub objection.

**23.** An eighth objection, which was filed late by a WorldCom investor who has provided no proof of class membership and who submitted her claim form after the deadline, addresses the issue of attorneys' fees and is described below.

trying the case." *City of Detroit v. Grinnell Corp.*, 495 F.2d 448, 462 (2d Cir.1974).

■ A district court determines a settlement's fairness "by examining the negotiating process leading up to the settlement as well as the settlement's substantive terms." *D'Amato*, 236 F.3d at 85. The court should analyze the negotiating process in light of "the experience of counsel, the vigor with which the case was prosecuted, and the coercion or collusion that may have marred the negotiations themselves." *Malchman v. Davis*, 706 F.2d 426, 433 (2d Cir.1983) (citation omitted). A court must ensure that the settlement resulted from "arm's-length negotiations" and that plaintiffs' counsel engaged in the discovery "necessary to effective representation of the class's interests." *D'Amato*, 236 F.3d at 85.

■ In evaluating the substantive fairness of a settlement, a district court must consider factors enumerated initially in *Grinnell*:

> (1) the complexity, expense and likely duration of the litigation, (2) the reaction of the class to the settlement, (3) the stage of the proceedings and the amount of discovery completed, (4) the risks of establishing liability, (5) the risks of establishing damages, (6) the risks of maintaining the class action through the trial, (7) the ability of the defendants to withstand a greater judgment, (8) the range of reasonableness of the settlement fund in light of the best possible recovery, [and] (9) the range of reasonableness of the settlement fund to a possible recovery in light of all the attendant risks of litigation.

*D'Amato*, 236 F.3d at 86 (citation omitted).

■ Finally, public policy favors settlement, especially in the case of class actions. "There are weighty justifications, such as the reduction of litigation and re-lated expenses, for the general policy favoring the settlement of litigation." *Weinberger v. Kendrick*, 698 F.2d 61, 73 (2d Cir.1982).

■ Procedurally, not a modicum of doubt exists as to the fact that the 2005 Settlements were achieved after painstaking negotiations between extraordinarily well-represented adversaries. In addition, Lead Counsel attests that a thorough investigation of the financial status of the Director Defendants, Andersen, and the Officer Defendants was performed to assess what resources these defendants could contribute to their respective settlements. Substantively, consideration of the *Grinnell* factors strongly supports approval of the settlements.

### 1. Complexity, expense, and likely duration of the litigation

The litigation was extraordinarily complex, and even though the Court made every effort to conduct the litigation as efficiently as possible, it was a costly undertaking for all parties, particularly given the late stages in which the 2005 Settlements were reached. Nevertheless, further litigation would have resulted in considerable additional expense. By settling when they did, all defendants but Andersen avoided the expense of conducting a full trial, and all parties avoided the expense of the nearly inevitable post-trial briefing and appeals. Particularly with respect to the less-wealthy defendants, further litigation would have only served to extinguish the funds available to settle the Class claims.

### 2. Reaction of the Class

Out of some four million potential Class Members, more than 830,000 of whom submitted proofs of claim, only seven filed timely formal objections to the 2005 Settlements. The very low number of objections

evidences the fairness of those settlements. *See Grinnell,* 495 F.2d at 462.

### 3. Stage of the proceedings and the risk of further litigation

The Underwriters' and Directors' Settlements were accomplished on the eve of trial; the Andersen Settlement, after several weeks of trial, immediately preceding closing arguments; and the Officers' Settlements, after those defendants had testified in the criminal case against Ebbers[24] and after the Andersen trial had ceased. All parties were thus superbly equipped to evaluate the strengths and weaknesses of their cases.

Even at these late stages of the litigation, however, there were significant risks on all sides, many of which were described in the Class Notice. With respect to both Securities Act and Exchange Act claims, the falsity of many alleged misstatements was in dispute. All active defendants[25] facing Securities Act Section 11 claims stemming from the 2000 and 2001 Offerings had asserted due diligence defenses and might have been successful at establishing the adequacy of their efforts at trial. Active Section 11 defendants, with the exception of Andersen, might have been able to establish that no "red flags" put them on notice of wrongdoing and that they were thus entitled rely on WorldCom's audited financial statements. Defendants facing Securities Act Section 12(a)(2) claims might have been able to establish that they exercised reasonable care.[26] In addition, the Lead Plaintiff

might not have been able to establish that Andersen and Kellett, who faced Exchange Act 10(b) claims, acted knowingly or recklessly with respect to the misstatements. *See* 15 U.S.C. § 78j; 17 C.F.R. § 240.10b–5. (Such a state of mind clearly existed on the part of the Officer Defendants, however, who were found guilty of or pleaded guilty to criminal charges.) The Director Defendants, all of whom faced liability under Exchange Act Section 20(a), might have been able to prove that they "acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action." 15 U.S.C. § 78t(a). The Director Defendants and Andersen also argued that their proportionate share of responsibility was minimal compared to the WorldCom insiders who perpetrated the fraud.[27] In addition, with respect to both Securities Act and Exchange Act claims, the defendants contested the extent to which the decline in the prices of WorldCom securities was due to the WorldCom accounting fraud as opposed to other market forces.

### 4. The range of reasonableness of the settlement fund and the ability of defendants to withstand a greater judgment

The 2005 Settlements are, in virtually each instance, of historic proportions. Purchasers of the WorldCom bonds issued in the 2000 and 2001 Offerings, who accordingly possessed Securities Act claims against all defendants, will recover approximately $4.852 billion—$3.452 billion from

---

**24.** Ebbers took the stand in his own defense, and Sullivan, Myers, and Yates were Government witnesses.

**25.** As noted above, by the time the 2005 Settlements were achieved, the claims against Ebbers, Sullivan, Myers, and Yates had been severed.

**26.** The various Securities Act defenses are described in the Opinion pertaining to the Underwriter Defendants' summary judgment motion. *See WorldCom,* 346 F.Supp.2d at 662–63.

**27.** The proportionate liability scheme of the Exchange Act is described in *WorldCom,* 2005 WL 335201, at *6–*8.

the present settlements, and $1.4 billion from the Citigroup Settlement. The bonds issued in the 2000 and 2001 Offerings were worth approximately $16.9 billion, of which $15.3 billion was still outstanding at the end of the Class Period, and Lead Plaintiff's damages model attributed some $10.6 billion of damages to the alleged misstatements in the Registration Statements for the offerings. The Lead Plaintiff estimates that the average recovery per $1000 face amount of the bonds issued in the 2000 and 2001 Offerings will be $426.66, based on the total funds recovered through the Citigroup Settlements and the 2005 Settlements, the number of bonds outstanding at the end of the Class Period, and the estimated amount of bonds held by persons who opted out of the Class. This recovery does not include the significant amount that bondholders have already recovered through the WorldCom bankruptcy proceedings.[28] Given the risks that would have been inherent in proceeding with the trial and any appeals, the settlement amount that will be allocated to the Securities Act claims is more than reasonable; it is remarkable. The Underwriter Defendants obviously have the financial resources to pay more than they have, but the Underwriters' Settlements have contributed to a total recovery that goes a long way toward making bondholders whole.

Purchasers of other WorldCom securities stand to recoup a far smaller percentage of their losses.[29] Even combined with the approximately $1.175 billion allocated to Exchange Act claims in the Citigroup Settlement, the funds received in the 2005 Settlements represent only a fraction of the recovery achieved for purchasers of bonds in the 2000 and 2001 Offerings.

The only defendants involved in the 2005 Settlements who faced Exchange Act claims are Andersen, now defunct and retaining limited assets; the Director Defendants,[30] who have collectively given up twenty percent of certain personal assets and whose settlements were supplemented by $36 million in contested insurance funds; and the Officer Defendants. Of the Officer Defendants, Ebbers and Sullivan have contributed substantially all of their personal assets to this and other settlements, and Yates and Myers are effectively insolvent. Thus, the pool of resources from which the Lead Plaintiff could seek recovery through this round of settlements for purchasers of stock and pre-existing bonds was relatively shallow, and because purchasers of stock and pre-existing bonds incurred aggregate losses many times greater than those of bond purchasers in the 2000 and 2001 Offerings, the recovered sums will be diffused much more widely.[31]

The Lead Plaintiff has included protections in the settlement agreements with the Exchange Act defendants providing

---

28. The amount of the bankruptcy recovery will be discussed below in respect to the objection by the Cerberus Objectors.

29. As one Class Member, S. Kaiser, expressed in an e-mail message to the Victim/Witness Coordinator at the U.S. Attorney's Office, WorldCom shareholders will receive "peanuts" in comparison to purchasers of bonds issued in the 2000 and 2001 Offerings.

30. The Director Defendants faced control-person claims under the Exchange Act. A single

Director Defendant, Kellett, also faced an Exchange Act Section 10(b) claim.

31. The Lead Plaintiff estimates that approximately 2.49 billion shares of WorldCom common stock were capable of being traded during the Class Period, which conveys some idea of how thinly the recovery must be spread. Holders of bonds issued prior to the 2000 and 2001 Offerings may recover on Exchange Act claims as well.

recourse for the Class should these defendants' financial representations be false. The Lead Plaintiff—who, it should be noted, was not a purchaser of bonds in the 2000 and 2001 Offerings and thus will recoup the same proportion of its losses as all other Class Members with only Exchange Act claims—estimates that Class Members will recover only an average of $0.56 per share of common stock. It has nonetheless still recovered a fair and, when the Citigroup Settlement is considered, even a remarkable amount for shareholders, given the circumstances.

*Objections by Class Members*

1. Objection to the Class Notice [32]

■ The standard for measuring the adequacy of a settlement notice in a class action is reasonableness. *Wal–Mart Stores, Inc. v. Visa U.S.A., Inc.*, 396 F.3d 96, 113 (2d Cir.2005). "There are no rigid rules to determine whether a settlement notice to the class satisfies constitutional or Rule 23(e) requirements; the settlement notice must fairly apprise the prospective members of the class of the terms of the proposed settlement and of the options that are open to them in connection with the proceedings." *Id.* at 114 (citation omitted). "Notice is adequate if it may be understood by the average class member." *Id.* (citation omitted).

■ Moulton, who purchased a total of 54 shares of WorldCom stock during the Class Period, resulting in a loss of approximately $404, argues that the Class Notice was defective because the Class Definition is vague. Moulton did not file a proof of

claim and therefore does not have standing to bring her objections.[33] *See State of New York by Vacco v. Reebok Int'l, Ltd.*, 96 F.3d 44, 47 (2d Cir.1996) ("For standing to exist, a would-be litigant must have sustained a palpable injury that is likely to be redressed by a favorable decision."). In any event, Moulton's objections are frivolous.

■ Moulton contends that the phrase "who were injured thereby" necessitates "a subjective, merits-based inquiry far beyond a simple determination of whether a given person did or did not purchase or acquire WorldCom, Inc. securities during the class period," rendering Class membership "unknowable." She also argues in conclusory form and without explanation that the relief described in the Class Notice regarding the settlement is "vague and confusing." Acknowledging that the 2005 Settlements achieved a "remarkable" recovery for the class, Moulton's attorney elaborated on her objection at the Fairness Hearing, explaining that the Class Definition might be confusing to a person who had isolated losses but net gains from securities purchased during the Class Period, or who faced divergent results from purchases of different types of securities.

A purchaser of WorldCom securities who believed that she had a legally cognizable injury attributable to those purchases would have been on notice that she was included in the Class. It is sufficient that the Class Definition gave putative Class Members who believed they had colorable legal claims arising from purchases

---

32. A number of objectors make arguments relating to the Class Notice. All but one of these are more appropriately addressed in the discussions of the Release and Supplemental Plan that follow.

33. Several days after the Fairness Hearing, Moulton submitted a "Notice Regarding the Court's Inquiry Regarding Standing" reaffirming that Moulton had an out-of-pocket loss arising from her purchase of WorldCom securities during the Class Period, but she still does not contradict the Lead Plaintiff's contention that she did not submit a proof of claim.

of WorldCom securities enough information to alert them that they needed to opt out of the Class if they wished to pursue their claims separately. Moulton's objection based on the alleged vagueness of the Class Definition is accordingly rejected.

Moulton's objection to the description of the relief provided by the Class Notice must likewise be rejected. The Class Notice and the Executives' Settlement Notice together listed the amounts of all of the 2005 Settlements. The Supplemental Plan describes in detail the allocation of the settlement proceeds among Class Members who filed proofs of claim.

### 2. Objections to the Scope of the Release

 Three Class Members, Berger, Reynolds, and Moulton, have objected to the scope of the Release to be imposed pursuant to the 2005 Settlements. As the Second Circuit recently noted, "Practically speaking, class action settlements simply will not occur if the parties cannot set definitive limits on defendants' liability." *Visa*, 396 F.3d at 106 (citation omitted). The scope of a settlement release is limited by the "identical factual predicate" and "adequacy of representation" doctrines. *Id.* "The law is well-established in this Circuit and others that class action releases may include claims not presented and even those which could not have been presented as long as the released conduct arises out of the 'identical factual predicate' as the settled conduct." *Id.* at 107. "[A]dequate representation of a particular claim is determined by the alignment of interests of class members, not proof of vigorous pursuit of that claim." *Id.* at 113.

#### a. Berger

 Berger, who purchased 250 shares of WorldCom stock in 1998 and 100 shares on September 20, 2000,[34] contends that the Release is overinclusive because it bars claims against settling defendants arising from the purchase of WorldCom securities prior to the Class Period, which began on April 29, 1999, and that Class Members were not given adequate notice that such claims would be barred. Berger, who has filed a Statement of Claim against SSB, one of the Citigroup Defendants, with the National Association of Securities Dealers ("NASD"),[35] represents that she did not opt out of the Class because she did not believe claims arising from her 1998 purchases would be barred by the Release. Additionally, Berger argues that the 2005 Settlements do not provide adequate consideration for the release of claims arising from purchases made prior to the Class Period.

To the extent that Berger objects to the Release imposed pursuant to the Citigroup Settlement, her objection is untimely and has been waived. Moreover, because the Release may only be applied to bar claims based on the same factual predicate as those brought by the Lead Plaintiff in the class action, its scope is entirely appropriate under the standards set forth in *Visa*

---

34. Berger sold 75 shares of WorldCom stock on December 28, 2001. She presumably held the rest until they were exchanged for MCI stock pursuant to the WorldCom bankruptcy reorganization.

35. Berger's arbitration claims against SSB were enjoined by this Court after a show cause hearing on August 26, 2005, on the grounds that they are barred by the claims release imposed pursuant to the Citigroup Settlement. All of Berger's arbitration claims concerning her WorldCom investments unquestionably arise from the identical factual predicate that forms the core of the allegations brought by the Class against SSB. Berger has filed a proof of claim in the class action.

and earlier cases.[36]

Berger and other Class Members were given fair and adequate notice that they were members of the Class and that they would be bound by the terms of any settlement in the litigation. The Class Definition has featured prominently in every notice sent out to date, including the December 2003 Notice. That Notice set forth the Class Definition in its very first lines and stated, underscored and in bold: "If you do not request to be excluded from the Class ... you will be bound by the decisions and outcome of this lawsuit." No representation was ever made that the dates bounding the Class Period would correspond to any release, or to anything other than the definition of the Class. Class Members were given an extraordinarily long period of time in which to opt out. See WorldCom, 2004 WL 2591402, at *5.

There is obviously no legal requirement that a notice of the pendency of a class action include a description of a release that may someday be negotiated to resolve claims brought in the class action, and the Class did not receive notice of the Release to be applied pursuant to the 2005 Settlements prior to the opt-out date. Nevertheless, because of the extension of the opt-out period, Class Members effectively

did have the opportunity to opt out upon knowledge of the scope of the Release: the Class received notice of the identical claims release imposed pursuant to the Citigroup Settlement approximately a month prior to the opt-out date. At the time of the Citigroup Settlement, only one Class Member objected to the scope of the claims release, and that objection was of a different nature. See WorldCom, 2004 WL 2591402, at *12–*13. In any event, the Second Circuit has explicitly rejected the contention that Class Members must be given a second opportunity to opt out after the terms of a settlement are announced. See Visa, 396 F.3d at 114. Given the notices distributed to the Class, and the opportunities granted to the Class to opt out and later to object to the 2005 Settlements, there is no reason here to permit a second opportunity to opt out.

Nor is there any merit to the contention that Berger and those Class Members who also made pre-Class Period purchases of WorldCom securities are receiving inadequate compensation for their claims, as it appears highly unlikely that they could establish a factual basis for recovery. At the Fairness Hearing, Lead Counsel confirmed that April 29, 1999 was chosen as the beginning of the Class Period because it was the first date on which the Lead

---

36. The Release does not state that its application is bounded by the "identical factual predicate" doctrine, but the addition of language releasing claims "arising from the same facts," or similar formulations, would be unnecessary and redundant. It is, after all, a given that the Release will only be applied insofar as its application conforms to the law. For example, on numerous occasions, parties have litigated before this Court whether claims may be enjoined pursuant to the Citigroup Settlement release. That the "identical factual predicate" and "adequate representation" doctrines limit the effect of that identically worded release has never been disputed. Because the determination whether a given claim is predicated on identical facts as the class action claims is inherently an individualized, fact-specific one, adding broad language specifying that only claims arising from an identical factual predicate are to be released would certainly not reduce litigation over the release of specific claims and may even be more likely to produce claims that Class Members were confused or misled. Nor, given the numerous factual allegations in the complaint, would it be feasible to provide in the Release a full description of the factual scenarios on which the class action claims were based. It should be noted that the Lead Counsel Website gave Class Members access to all of the class action pleadings and the Opinions issued in the Securities Litigation, among many other documents.

Plaintiff could point to evidence of a misstatement by WorldCom of its financial information.[37] Lead Counsel noted that the SEC chose the same date for its civil enforcement proceedings against WorldCom for the same reason.

Additionally, the inflation in WorldCom's stock price, as allocated by the Lead Plaintiff based on its experts' evaluation of the relevant evidence, was concentrated toward the end of the Class Period. It is telling in this regard that no one in the Class has objected to that portion of the Supplemental Plan, explained at Paragraph 14 and demonstrated in various charts appended to the Supplemental Plan, which calculates that the inflation started with relatively smaller percentages during the first quarters of the Class Period and gradually increased to nearly 100% toward the end of 2001.[38] This allocation of inflation reflects the relationship that each quarter's earnings overstatement bore to the total amount of the earnings overstatements in WorldCom's SEC filings.

Thus, in addition to other barriers an investor may face in obtaining recovery for losses from WorldCom investments purchased prior to the Class Period, including the statute of limitations, there is compelling evidence that WorldCom's manipulations of its financial reporting did not impact prior periods in any material way that requires compensation in order for the settlements to be approved as fair. Settlement proceeds may be allocated according to the strengths and weaknesses of the various claims possessed by Class Members. *See In re Holocaust Victim Assets Litig.*, 413 F.3d 183, 186 (2d Cir. 2001) (reissued 2005) ("Any allocation of a settlement of this magnitude and comprising such different types of claims must be based, at least in part, on the comparative strengths and weaknesses of the asserted legal claims."). Fairness does not require that Class Members be compensated for losses stemming from purchases at prices that it would be extraordinarily difficult to argue were inflated by the malfeasance alleged in the complaint.

Had Berger wished to press her claims outside the confines of the class action, she had an opportunity to opt out. Because she chose to remain a Class Member, there is no unfairness in applying the Release to all of her claims, even if they involve securities purchased prior to the Class Period, so long as they are predicated on the same facts alleged in the class action complaint. Her objection is thus rejected.

### b. Reynolds

Reynolds is another Class Member who has pursued separate litigation against WorldCom (the "Reynolds Action"). Reynolds lawsuit was enjoined in April 2005 by Judge Arthur J. Gonzales of the U.S. Bankruptcy Court for the Southern District of New York, who oversaw the WorldCom bankruptcy proceedings, on the ground that Reynolds' claims are derivative and are therefore the exclusive property of the bankruptcy estate. *See In re WorldCom, Inc.*, 323 B.R. 844, 856 (Bankr. S.D.N.Y.2005). Reynolds' appeal of that injunction is pending.

The Reynolds Action alleged that the WorldCom board of directors declared a

---

**37.** While the statute of limitations for the class action allowed claims to be brought for the three-year period before April 30, 2002, the defendants never challenged the choice of a class period beginning one day earlier.

**38.** For example, the artificial inflation was approximately $1 of the $55.90 closing price of WorldCom common stock as of April 29, 1999, but $12.50 of the $14 closing price on December 31, 2001.

dividend for shares of MCI Tracking Stock on March 6, 2002, and later, on July 11, 2002, announced that the dividend would not be paid. It pleaded four claims against certain of the Director Defendants in the class action, two of which Reynolds represents to be premised on the shareholders' right to receive the withdrawn dividend, two of which regard "conduct . . . affect[ing] the individual right of the holders of [WorldCom and MCI Tracking Stock shares] to make voting and investment decisions based upon accurate information." Reynolds argues that the Reynolds Action claims were not based on factual predicates identical to those underlying the class action claims. He argues that the scope of the Release should thus be modified to exclude his claims.

The Release is not overly broad in its present form. As noted above, the effect of the Release is limited by the "identical factual predicate" and "adequacy of representation" requirements that the Second Circuit has imposed. Given that Reynolds will only be able to litigate his Reynolds Action claims if he succeeds on his appeal of the bankruptcy court's determination, his objection to the Release is based on highly speculative concerns. Whether the specific claims pleaded in the Reynolds Action are barred by the Release is not a determination that needs to be made at this time. It should be noted, however, that Reynolds' complaint relies on allegations that WorldCom's board of directors had knowledge that WorldCom's financial statements were inaccurate and declared the dividend in March 2002 anyway. Such allegations fall squarely within the Class Period and concern the same financial wrongdoing addressed by the class action.

### c. Moulton

Moulton contends that the Release is overly broad in that it releases claims "that were never investigated nor prosecuted against the released parties." She also argues that the Release is improper because it extends to persons and entities never sued. Each objection is made generally and without identifying any specific claim or person. Moreover, Moulton's counsel pursued neither contention during his oral presentation at the Fairness Hearing. Moulton contends that, based on these arguments, the breadth of the Release renders the 2005 Settlements unfair due to lack of consideration.

■ As *Visa* makes clear, the fact that a release covers claims not actually pursued by a plaintiff in a class action does not render the release overbroad. *See Visa*, 396 F.3d at 107. Moulton's argument that the Release applies to claims against persons and entities uninvolved in the class action litigation is inaccurate; the Release applies by its terms only in respect to certain Settling Defendant Releasees, each of whom is properly released because of a direct connection to a settling defendant or because of its contribution to the settlements. Accordingly, her argument that the settlements are unfair lacks merit.

### 3. Objections to the Supplemental Plan

■ "To warrant approval, the plan of allocation must also meet the standards by which the settlement was scrutinized—namely, it must be fair and adequate." *Maley v. Del Global Technologies Corp.*, 186 F.Supp.2d 358, 367 (S.D.N.Y.2002) (citation omitted). "An allocation formula need only have a reasonable, rational basis, particularly if recommended by experienced and competent class counsel." *Id.* (citation omitted).

### a. Laub

■ Laub is a Class Member who purchased WorldCom securities during the Class Period and sold them on a series of

dates prior to January 29, 2002. Laub's purchases add up to $59.2 million; his losses total more than $5 million. The Supplemental Plan, as originally proposed by the Lead Plaintiff and described in the Class Notice, provides no recovery to Class Members who sold securities prior to January 29, 2002, which is the earliest date on which Lead Plaintiff found evidence that a partial disclosure of World-Com's prior financial misstatements was made. Laub argues, first, that Class Members should have had notice before the opt-out period closed that damages would be allocated in this manner. The fact that Class Members who sold prior to January 29, 2002 would not recover was not apparent to the Class until the Supplemental Plan was mailed out in July 2005, well after the opt-out date of September 1, 2004. Second, Laub argues that this allocation of damages is unfair, citing the loss causation analysis in *In re Parmalat Securities Litigation*, 375 F.Supp.2d 278, 305–06 (S.D.N.Y.2005).

In response to these objections, the Lead Plaintiff has proposed an alternative allocation for Exchange Act claimants that it opines would also be fair and reasonable. This alternative would provide recovery for losses incurred in sales of WorldCom securities prior to January 29, 2002, but would limit the Recognized Amount for such losses to ten percent of the Recognized Amount for losses from sales on or after that date. It would be entirely reasonable to adhere to the Supplemental Plan as originally proposed by the Lead Plaintiff and provide recovery under the Exchange Act to only those Class Members who sold or held securities on or after January 29, 2002. As discussed below, it

is unlikely that any losses sustained in the trading of WorldCom securities before that date can as a matter of law or fact be attributed to the filing of false financial statements by WorldCom. Nonetheless, it is also reasonable and perhaps fairer to give some modest recovery to Class Members who suffered losses prior to January 29, 2002.

One plea from a Class Member illustrates the problem. In an e-mail message to the U.S. Attorney's Office Victim/Witness Coordinator that was forwarded to the Court, Class Member Tom Roberts argues that fraud was occurring while he held his stock and justifies some recompense. He believed something was wrong about WorldCom's reported performance and "tried to be proactive" by selling promptly. He sold all of his WorldCom stock by January 21, 2000, suffering losses of approximately $174,000, and would have suffered an even greater loss if he had waited until 2002 to sell. He feels he should not be excluded from all recovery because of his prescience and diligence.

None of the notices sent to the Class before the opt-out period closed advised Class Members that January 29, 2002, or any other date, might be the cut-off date for recovery. While it was not feasible or necessary to give such notice, in its absence, Class Members may have formed an expectation that they could participate in any recovery that the Lead Plaintiff would be able to achieve for the Class.

The Lead Plaintiff's proposal that the recovery for those who sold before January 29, 2002 be limited to ten percent of the settlement fund strikes the proper balance. Under Exchange Act Section 10(b),[39] loss causation "is the causal link

---

**39.** The loss causation analysis under Securities Act Section 11 is a "mirror image" of that under Section 10(b). *WorldCom,* 2005 WL 375314, at *6. Under Section 11, that a plaintiff's losses were attributable to factors other

than disclosure of the alleged misstatements is an affirmative defense; that the alleged misstatements caused the plaintiff's losses is an element of a Section 10(b) offense. *See id.*

between the alleged misconduct and the economic harm ultimately suffered by the plaintiff." *Lentell v. Merrill Lynch & Co.*, 396 F.3d 161, 172 (2d Cir.2005) (citation omitted); *see also* 15 U.S.C. § 78u–4(b)(4). It is "often compared ... to the tort law concept of proximate cause, meaning that the damages suffered by plaintiff must be a foreseeable consequence of any misrepresentation or material omission." *Emergent Capital Investment Mgmt., LLC v. Stonepath Group, Inc.*, 343 F.3d 189, 197 (2d Cir.2003) (citation omitted). In *Lentell*, the Second Circuit reiterated two requirements for establishing loss causation. A plaintiff must prove "both that the loss [was] foreseeable *and* that the loss [was] caused by the materialization of the concealed risk." *Lentell*, 396 F.3d at 173 (emphasis in original).

Laub's counsel indicated in a reply brief and at the Fairness Hearing that Laub objected to the ten percent allocation, so Laub's original objection will be construed as one to the revised Supplemental Plan. In *Parmalat*, the case on which Laub relies, the court concluded that evidence of a corrective disclosure, such as that to which the January 29, 2002 date is tied in this class action, is not necessary to establish loss causation under Exchange Act Section 10(b). *See Parmalat*, 375 F.Supp.2d at 305. *Parmalat* cited *Suez Equity Investors, L.P. v. Toronto–Dominion Bank*, 250 F.3d 87, 98 (2d Cir.2001), for the proposition that no corrective disclosure is needed when "plaintiffs allege that the *subject* of the misrepresentations and omissions caused their loss." *Parmalat*, 375 F.Supp.2d at 306 (emphasis added). In *Suez Equity*, the alleged misrepresentations regarded the skills and experience of the principal of the company in question. The court ruled that "[s]ince defendants reasonably could have foreseen that [the individual's] concealed lack of skill would cause the company's eventual liquidity problems, defendants' misrepresentations may be the causal precursor to the [company's] final failure." *Suez Equity*, 250 F.3d at 98. In *Lentell*, the Second Circuit explicitly stated that interpreting *Suez Equity* to stand for the proposition that a plaintiff need not prove that investors' losses were caused by the materialization of a concealed risk would be a misreading of the case. *Lentell*, 396 F.3d at 173. *Parmalat* was wholly consistent with *Lentell*, making clear that the risk disguised by the misrepresentation alleged in that case had materialized—Parmalat, which had massive undisclosed debt, began defaulting in its payments to bondholders—and hence had "arguably caused the decline in shareholder and bondholder value." *Parmalat*, 375 F.Supp.2d at 307.

Neither Laub nor any other objector has identified any partial disclosure of the WorldCom fraud that occurred earlier than January 29, 2002. At the Andersen trial, Lead Plaintiff's expert attributed all declines in the market price of WorldCom's stock before January 29, 2002 to market conditions or industry factors, and Lead Counsel has submitted charts in connection with its application for approval of the modified Supplemental Plan which show that the declines in the price of WorldCom stock [40] prior to January 29, 2002 were consistent with the declines in the stock prices of AT & T and Sprint, WorldCom's chief competitors. Moreover, Laub does not point to an earlier date on which a concealed risk materialized in *any* manner. His arguments for why the reasoning of *Parmalat* should apply here are thus unconvincing.

---

**40.** Since the price of WorldCom bonds did not fall below par until after January 29, 2002, those Class Members who sold bonds before that date did not sustain any compensable loss and are unaffected by this dispute.

Laub argues that WorldCom's fraudulent reporting of its line costs, its misclassification of assets in connection with acquisitions to inflate earnings, its failure to record timely impairment in the value of goodwill, and a dubious analytical model used by SSB securities analyst Jack Grubman [41] to tout WorldCom securities "were all subjects of Defendants' material misrepresentations and omissions that caused WorldCom investors' losses and it was foreseeable that they would eventually do so." Without materialization of a concealed risk, however, such allegations are insufficient to prove loss causation, as all that they establish is that the price of WorldCom securities was inflated by the misrepresentations. As the Supreme Court recently confirmed in *Dura Pharmaceuticals, Inc. v. Broudo*, — U.S. —, 125 S.Ct. 1627, 161 L.Ed.2d 577 (2005), "[n]ormally ... an inflated purchase price will not itself constitute or proximately cause the relevant economic loss." *Id.* at 1631. Unless Laub can establish that his losses were attributable to some form of revelation to the market of the wrongfully concealed information, they are not recoverable in a private securities action. Such actions are available, after all, "not to provide investors with broad insurance against market losses, but to protect them against those economic losses that misrepresentations actually cause." *Id.* at 1633.

In light of this loss causation analysis, the new Supplemental Plan providing ten percent of the normal recovery to those who sold their stock before January 29, 2002 is fair. It would be highly unlikely, based on the facts unearthed through significant investigation and discovery in this case, that a plaintiff could establish that losses from the sale of WorldCom securities prior to that date were attributable to the WorldCom fraud. Indeed, the financial manipulation at WorldCom kept the prices of its securities artificially inflated and illegally protected WorldCom investors to some degree before the corrective disclosures were made. The Lead Plaintiff would have been highly motivated to find evidence of disclosures of the WorldCom fraud to the market prior to January 29, 2002, as such evidence would have allowed it to submit a damages calculation under which a smaller proportion of the decline in the price of WorldCom stock was attributable to other factors.[42] The Court is thus confident that the interests of Laub and similarly situated Class Members were well-represented in this regard.

Laub argues that his substantial losses from trading that ended by January 11, 2000 deserve equal treatment with losses incurred by investors who sold or held securities after January 29, 2002. Lead Counsel points out that all of Laub's trading occurred when WorldCom was still trading above $40 per share, while after January 29, 2002, WorldCom traded from approximately $10 to $1 per share. Depending on when they had purchased their shares, the Class Members who sold their shares in the latter period (or who retained their shares) suffered devastating losses.

Laub argues that only speculators bought WorldCom securities after January 29, 2002, and that speculators are less entitled to recovery than investors like him. Laub, who made ten purchases be-

---

**41.** Grubman was one of the Citigroup Defendants.

**42.** Even the defendants, who were highly motivated to locate the earliest "inquiry notice" date possible to support their statute of limita-

tions motion brought against certain WorldCom Individual Actions, only argued that investors were on notice of the fraud as of April 20, 2002. *See In re WorldCom, Inc. Sec. Litig.*, 294 F.Supp.2d 431, 446–47 (S.D.N.Y. 2003).

tween May 1999 and January 2000, buying between $2 million and $9 million of stock on each occasion, sold his WorldCom stock within a few weeks or even a few days of purchase. This is not the pattern of a long-term investor. In any event, the Supplemental Plan distinguishes among Class Members by their date of sale, not their date of purchase. Laub has provided no basis to find that the investors who sold after January 29, 2002 also purchased their securities after that date, or any other basis to denigrate this entire category of investors as speculators. Moreover, the Supplemental Plan provides the larger recovery not just to those investors who sold their shares after January 28, 2002, but also to those who still held their shares as of June 25, 2002.

As noted above with respect to the Berger objection, settlement proceeds may be allocated with respect to the strengths and weaknesses of various claims. *In re Holocaust Victim Assets Litig.*, 413 F.3d at 186. The Lead Plaintiff cites at least four cases that approve a much smaller settlement distribution to class members with predisclosure sales of securities. *See Global Techs. Corp.*, 186 F.Supp.2d at 367 (awarding twenty percent of their recognized losses); *In re MicroStrategy, Inc. Sec. Litig.*, 148 F.Supp.2d 654, 668 (E.D.Va.2001) (ten percent); *In re Ikon Office Solutions, Inc. Securities Litigation*, 194 F.R.D. 166, 184 (E.D.Pa.2000) (ten percent and less); *In re Sapiens Securities Litigation*, No. 94 Civ. 3315(RPP), 1996 WL 689360, at *2 (S.D.N.Y. Nov.27, 1996) (thirty percent); *cf. also In re Charter Communications, Inc.*, No 4:02–CV–1186 CAS, 2005 U.S. Dist. LEXIS 14772, at *33 (E.D. Mo. June 30, 2005) (allocating settlement funds on basis of the relative strengths and weaknesses of class members' individual claims and the timing of purchases and sales of the securities at issue); *In re Gulf Oil/Cities Serv. Tender Offer Litig.*, 142 F.R.D. 588, 596 (S.D.N.Y.1992) (same).

Laub argues in his reply brief that the proposed allocation of ten percent of the regular Recognized Amount for sales prior to January 29, 2002 is entirely arbitrary. There is no mathematical formula that can be used to determine precisely how much of the Exchange Act settlement funds should be shared with investors who have only a very remote probability of any recovery through litigation but who for the reasons already explained deserve a modest share of recovery. The Lead Plaintiff has chosen a figure that is fair and reasonable in the circumstances.

Finally, Class Members had fair and adequate notice that they would be bound by the terms of any judgment or settlement unless they opted out of the class action by the prescribed date. As Laub notes, the December 2003 Notice stated that "If you choose to remain in the Class, you will be entitled to your share of any money awarded to the Class either through a settlement with the defendants . . . ." The December 2003 Notice also specified, however, that "[i]n the event of a settlement, Lead Plaintiff will be required to obtain preliminary approval of such a settlement from the Court, including preliminary approval for a proposed plan of allocation for settlement proceeds . . . . The Court will only give final approval to a proposed settlement and plan of allocation if the Court finds them to be fair, adequate, and reasonable to the members of the Class." In the Citigroup Settlement Notice, mailed prior to the September 1, 2004 opt-out deadline, Class Members were informed that the Supplemental Plan, to be submitted to the Court "at a future time," would determine "how each portion of the Settlement proceeds shall be allocated" to the Class. Class Members were also advised on the first page of the Citigroup Settlement Notice that "[s]ome Class Members may recover more or less . . . depending on, among

other factors, when their shares and bonds were purchased or sold." None of these statements can be construed as a promise to Class Members that all claims would be treated as if equal in merit. Laub's objection must accordingly be rejected.[43]

b. The Cerberus Objectors

■ The Cerberus Objectors, who purchased more than $140 million of WorldCom securities during the Class period, have two objections to the Supplemental Plan. Both of these have been resolved by agreement with the Lead Plaintiff.

First, the Cerberus Objectors contend that, in Paragraphs 18 and 19 of the Supplemental Plan, the methodology for determining Recognized Amounts for bonds purchased in the 2000 and 2001 Offerings overvalues the "aggregate value of consideration received" for the bonds in the WorldCom bankruptcy proceeding. The Supplemental Plan currently states the amount of consideration as $357 per $1000 face amount. The Cerberus Objectors argue that the amount of consideration is actually $255 per $1000 face amount for

bonds exchanged for new common stock in accordance with WorldCom's Plan of Reorganization, as the $255 represents the corresponding market value of the common stock on the date the bonds were actually exchanged.

In WorldCom's Second Amended Joint Plan of Reorganization, approved by the bankruptcy court on October 21, 2003, WorldCom bondholders were given the choice of exchanging their notes for 14.28 shares of newly issued MCI common stock per $1000 face amount, new notes in a principal amount equal to $357 per $1000 face amount, or some combination of MCI common stock and new notes. Bondholders overwhelmingly opted for the notes, however, so the notes were oversubscribed. According to a September 13, 2005 submission by Lead Counsel, bondholders who requested notes in fact received only 46.85% of the notes that they sought; the remaining value of their distribution was in the form of MCI stock. Based on this ratio, the Lead Plaintiff proposes that the Supplemental Plan be altered to use a value of $302 per $1000

---

**43.** At the Fairness Hearing, Laub's attorney intimated that the Lead Plaintiff had intentionally delayed disclosure of the Supplemental Plan. There is absolutely no basis for such an accusation. It was prudent and entirely reasonable to delay development of the Supplemental Plan until expert damages reports had been served, and indeed, until after the 2005 Settlements had been achieved.

Laub's attorney also argued that the allocation of ten percent of the normal recovery to Class Members who sold their securities prior to January 29, 2002 disadvantages Class Members who elected not to submit proofs of claim because they believed they would not recover, and that another notice period is therefore necessary. This argument has no merit, however, in light of the fact that the original deadline for filing a proof of claim was March 4, 2004, a date before the Supplemental Plan had been developed and distributed to Class Members and before the announcement in the Hearing Order that Class

Members would have a second opportunity to submit proofs of claim. Any Class Member, regardless of the date on which she sold her securities, who wished to preserve her right to share in the eventual recovery should have filed a proof of claim before the March deadline; the second opportunity was essentially a windfall.

On September 15, 2005, Laub submitted an objection to the proposed Order approving the modified Supplemental Plan of Allocation. Laub argues that the modified Supplemental Plan was not supported by documents and affidavits showing its reasonableness and fairness to Class Members. Counsel for the Lead Plaintiff did attest to its fairness in a supplemental declaration accompanying Lead Plaintiff's reply brief, as well as at the Fairness Hearing. Laub also makes several arguments to the effect that no evidentiary basis exists for a finding that the Supplemental Plan is reasonable as modified. These arguments have already been addressed.

face amount of bonds to reflect the consideration received by bondholders in the WorldCom bankruptcy. Lead Plaintiff's proposal is fair and reasonable, and is approved.

Second, the Cerberus Objectors note that Paragraph 24 of the Supplemental Plan defines WorldCom Predecessor Bonds to include bonds issued by Intermedia, an entity acquired by WorldCom in September 2000, but does not provide a methodology for determining Recognized Amounts relating to purchases of Intermedia 13 1/2% Preferred Stock due 2009 ("Intermedia 13 1/2% Preferred Stock"). In response to this objection, the Lead Plaintiff notes that it did not originally have sufficient trading data for Intermedia 13 1/2% Preferred Stock but has since acquired more information. It has accordingly proposed a modification to the Supplemental Plan allowing Recognized Amounts to be calculated for purchases of

this stock using the same methodology used in the Supplemental Plan to calculate Recognized Amounts for other forms of Intermedia preferred stock. Lead Plaintiff's proposal to allow Recognized Amounts to be calculated for the Intermedia 13 1/2% Stock is approved.[44]

c. Moulton

Moulton contends that "intraclass conflicts" exist between purchasers of bonds in the 2000 and 2001 Offerings, who have Securities Act claims against the various defendants, and purchasers of other WorldCom securities. Since she characterizes her objection as one to the Plan of Allocation, she presumably does not intend to argue that conflicts of interest existed between these classes of securities holders in the prosecution of the action itself. Moulton's objection is entirely conclusory, and her attorney did not elaborate on it at the Fairness Hearing, but she appears to

**44.** The Cerberus Objectors dropped two of the four objections they originally filed. They argued that Paragraph 27.b. of the Supplemental Plan should be altered to reflect that the Net Market Loss (or Net Market Profit) of each claimant is to be determined by netting profits and losses only on securities purchased or acquired during the Class Period, rather than subsequent to the Class Period. At the Fairness Hearing, their counsel agreed that this alteration is unnecessary, as the Supplemental Plan, at Paragraphs 2 and 27, clearly indicates that Recognized Amounts are only calculated for purchases or acquisitions made during the Class Period.

The Cerberus Objectors also took issue with the fact that the Supplemental Plan does not provide a mechanism to dispute or appeal the Claims Administrator's determination of a claimant's Aggregate Recognized Amounts or Claim Form Amounts. As the Lead Plaintiff's reply brief explains, the Hearing Order prescribes a dispute resolution mechanism pursuant to which each Class Member who is determined to have a deficient or rejected claim will be sent a letter informing her of this determination and

will have thirty days from the date of the letter to supply documentation or an explanation to the Claims Administrator. If the Class Member does not respond, the Class Member's claim will be considered finally rejected. If the Class Member timely responds to the letter, Lead Counsel, through the Claims Administrator, will determine if the documentation or explanation has remedied the deficiency or rejection. If it has not, the claim will be deemed finally rejected at that time. All such finally rejected claims will be submitted to the Court when the Lead Plaintiff moves for an Order approving distribution of the settlement funds. Notice of any hearing on such a motion will be provided to all Class Members whose claims are disputed. In addition, Lead Plaintiff contemplates making two distributions of the settlement funds. The first distribution will be of approximately ninety percent of the overall funds, while ten percent will be held back to assure that sufficient funds remain in the event that a Class Member successfully objects to a distribution. At the Fairness Hearing, counsel for the Cerberus Objectors indicated that the procedures specified by the Lead Plaintiff were satisfactory.

be objecting to the allocation of settlement funds between purchasers of bonds giving rise to Securities Act claims and purchasers of other securities on which Exchange Act claims are premised.

Moulton is correct that there is tension between the interests of Class Members with Securities Act and Exchange Act claims. With respect to the Underwriters' Settlements, however, it would be manifestly unfair to allocate those monies to purchasers of stock and pre-existing bonds with only Exchange Act claims, as the Underwriter Defendants faced only Securities Act claims arising from their participation in the 2000 and 2001 Offerings. The proceeds of the Directors', Andersen, Ebbers, and Sullivan Settlements are to be allocated in a 4:1 ratio of Exchange Act to Securities Act claims.[45] Although this ratio favors Class Members with Exchange Act claims, it is entirely appropriate given the very substantial recovery obtained for Class Members who purchased bonds in the 2000 and 2001 Offerings. The Class was represented by four named defendants, each with different stakes in the litigation. The Lead Plaintiff did not purchase bonds from the 2000 and 2001 Offerings, while the remaining three named defendants did do so. Their agreement that the 4:1 ratio is appropriate adequately addresses any concerns about the existence of a conflict. It is noteworthy that the Settlement Judges endorsed this ratio in their statement in support of the Andersen Settlement.

d. Norman

■ Norman is the proposed class representative for a lawsuit brought by persons who participated in SSB's Guided Portfolio Management ("GPM") program

(the "GPM Action"). The accounts in the GPM program were discretionary accounts, for which brokers rather than account holders made the investment decisions. Norman alleges claims of breach of contract and breach of fiduciary duty, as well as a claim under the Investment Advisers Act of 1940, 15 U.S.C. § 80b–6, against SSB, one of the Citigroup Defendants. According to Norman, "[t]he core of [the GPM Action] complaint is that SSB invested its GPM customers' accounts based on research and ratings of securities SSB knew to be unreliable and provided by analysts who had a conflict of interest." The Norman action is pending before the Honorable Gerard E. Lynch. No class has been certified in the action. On June 9, 2004, finding that the complaint did not contain any allegation of fraud or misrepresentation, Judge Lynch denied a motion to dismiss the action that had argued that Norman's state law causes of action were preempted by Securities Litigation Uniform Standards Act (SLUSA). *Norman v. Salomon Smith Barney, Inc.*, 350 F.Supp.2d 382, 386 (S.D.N.Y.2004).

Despite the filing of his separate action, Norman did not opt out of the WorldCom class action. Norman objects to Paragraph 17 of the Supplemental Plan on the basis that it provides no recovery for GPM program members who sold securities before January 29, 2002. While he believes it may be appropriate to deny recovery to other Class Members who sold before that date, he contends that GPM program members should be treated differently. Although, as discussed above, Paragraph 17 of the Supplemental Plan is to be revised to provide Class Members who sold their WorldCom securities prior to January 29, 2002 with ten percent of the Recog-

---

**45.** This Opinion will not address the Plan of Allocation for the Citigroup Settlement, as the allocation of those funds was announced to the Class at the time of that settlement, and objections to the terms of the Citigroup Settlement that were not timely raised are now waived.

nized Amounts for other losses sustained by Class Members, Norman's attorney indicated at the Fairness Hearing that Norman continued to object to the allocation insofar as it does not adequately compensate GPM program members. In addition, Norman asks for a set-aside of $50 million on behalf of all GPM program members who are Class Members to compensate them for what he estimates were their $500 million in trading losses. He argues that GPM program members deserve special treatment because of the uniqueness and strength of their claims.

The November 12, 2004 Opinion approving the Citigroup Settlement allowed Norman to renew a request for a set-aside when the Supplemental Plan was issued. *See WorldCom*, 2004 WL 2591402, at *13 n. 35. That Opinion also determined that, to the extent Norman's claims were based on the purchase of WorldCom securities, they were based on the "same underlying factual allegations against SSB that are at the heart of the [class action complaint]" and thus were properly barred by the claims release imposed pursuant to the Citigroup Settlement. *Id.* at *13. This Court's reasoning was recently confirmed in an opinion by Judge Lynch regarding Norman's objection to a virtually identical claims release in another securities litigation. *See In re Global Crossing Sec. Litig.*, No. 02 Civ. 910(GEL), 2005 WL 1668532, at *4 (S.D.N.Y. July 12, 2005) (concluding that, to the extent Norman's claims could be fairly characterized as arising out of or relating to a decision to invest in Global Crossing securities, their release was "entirely appropriate"). To the extent Norman's objection is a renewed attack on the Release, and the well-established principle that a release may bar causes of action other than those litigated in the class action, it is rejected.

Norman contends that the theory of damages applicable to the GPM Action is fundamentally different than the concept of loss causation applicable to the class action, and that the January 29, 2002 disclosure date on which the Supplemental Plan relies should thus not determine the distribution of settlement proceeds to GPM customers.[46] Norman is still unable to identify his theory of damages, however.[47] To the extent that Norman's claims are based on investments in securities issued by WorldCom, the damages calculation would certainly be based on a theory of loss due to the misrepresentations of WorldCom's financial condition and SSB's alleged complicity in that fraud. These factors explain the decline in the market price of WorldCom securities, a decline experienced by all securities holders regardless of where or how they held their securities. In this regard, the Supplemental Plan is as fair to GPM customers who sold their WorldCom securities prior to January 29, 2002 as it is to other Class Members who sold their securities prior to that date, because the loss causation analysis is the same. As explained with regard to the Laub objection, January 29, 2002 was the first date upon which the Lead Plaintiff could point to a partial corrective disclosure. The decline in the price of WorldCom securities prior to that date must therefore be attributed to factors other than the fraud.

---

46. Norman also notes that the GPM class action does not rest on the "fraud on the market" theory of causation. The "fraud on the market" theory applies to transaction causation, however, not loss causation. *See WorldCom*, 219 F.R.D. at 291.

47. Norman could not identify his theory of damages at the September 9 Fairness Hearing or at the Citigroup Settlement fairness hearing. *See WorldCom*, 2004 WL 2591402, at *12.

As for Norman's request for a set-aside, it is completely lacking in merit. Norman provides no basis whatsoever for his damages figure on behalf of a class that has not even been certified. Moreover, he has provided no basis to find that the GPM claims are stronger than those prosecuted by the Class. Had that been his genuine belief, one would have expected someone seeking to represent a class of GPM account holders to opt out. Instead, he seeks to recover twice for losses associated with investments in WorldCom securities. It is telling that no other Class Member who purchased WorldCom securities through SSB is seeking special compensation. Because SSB's Jack Grubman was both the leading telecommunications analyst and cheerleader for WorldCom, SSB's recommendations were widely disseminated and can be fairly presumed to have affected the market for WorldCom securities and thus every investor in WorldCom. There is no principled basis to make a distinction in the amount of damages suffered based on the identity of a Class Member's broker. Norman's request for special treatment must accordingly be rejected.

### 4. Objection to the Proof of Claim Form

Thomason makes a narrow objection to the form of the Proof of Claim form. He notes that the Proof of Claim Form only has spaces for a Class Member to list direct purchases of WorldCom securities, and that there is no place to enter purchases of stock that were made for his benefit through an SSB Unit Investment Trust. Lead Counsel represents that such claims can be entered on the same form, with supporting documentation attached, and that the Claims Administrator will process such claims in the same manner as if the stock had been purchased directly by the Class Member. It represents that it has passed this information on to the few Class Members in Thomason's situation who have inquired. As such, Thomason's objection has been addressed.

### Attorneys' Fees and Costs

When the Citigroup Settlement was approved in November 2004, Lead Counsel were awarded $141.5 million in attorneys' fees. Lead Counsel have applied for $194,600,000 in attorneys' fees for the 2005 Settlements, an amount which constitutes just under 5.5% of the total amount of the Underwriters', Directors', and Andersen Settlements.[48] Fees will be calculated separately for the Underwriters' Settlements and the Directors' and Andersen Settlements [49] so that no Class Member possessing solely Exchange Act claims (that is, claims arising from purchases of WorldCom securities other than those bonds issued in the 2000 and 2001 Offerings) will bear any part of the fee awarded on the basis of the Underwriters' Settlements. Broken down, the fee request is $187,720,000 for the Underwriters' Settlements, or approximately 5.5% of the $3,427,306,840 gained from those settlements, and $6,880,000 from the Directors' and Andersen Settlements, or approximately 5.5% of the $125,750,000 recovered in those settlements. The total lodestar calculation submitted by Lead Counsel totals $83,183,238.70 through June 30, 2005.

---

48. Lead Counsel obtained approval from the Lead Plaintiff, and from the Court on September 22, 2003, to employ a few other law firms to assist with document review and other discrete tasks under the supervision of Lead Counsel. This fee award will also compensate those assisting firms.

49. Lead Counsel request no fees whatsoever for the Officers' Settlements, although those hours are used in the calculation of the total lodestar amount. Lead Counsel represents that, even if the time expended with respect to the Officers' Settlements was subtracted from the lodestar, the lodestar multiple would remain 4.0.

When combined with the attorneys' fees awarded pursuant to the Citigroup Settlement, the amount sought is equivalent to a lodestar multiple of 4.0.[50]

In support of the application for attorneys' fees, Lead Counsel have provided an affidavit by Lebowitz[51] and a summary of time records, including hourly rates and number of hours worked, for all attorneys and paraprofessionals assigned to the case. The total number of hours worked was 277,862. Two firms, Barrack Rodos & Bacine ("Barrack Rodos") and Bernstein Litowitz Berger & Grossmann LLP ("Bernstein Litowitz"), accounted for 84,934 and 129,642 of these hours, respectively. The billing rates for Barrack Rodos, a firm based in Philadelphia, ranged from $350 to $580 per hour for partners, from $225 to $420 for associates, and from $90 to $175 for paralegals. The rates for Bernstein Litowitz, a New York City firm, ranged from $450 to $695 for partners, from $250 to $450 for associates, and from $155 to $185 for paralegals.[52]

Despite full disclosure in the Class Notice that Lead Counsel would be requesting a fee not in excess of $195.4 million and payment of expenses in an amount not in excess of $12.5 million, no institutional investor has objected to this request, and many such investors are participating in the recovery achieved by the Class. Only one objection, that of Jane B. Selfe, remains to the attorneys' fees sought by Lead Counsel.[53] Selfe objects that 5.5% of such a large settlement fund is an unreasonable fee, citing *In re Domestic Air Transportation Antitrust Litigation,* 148 F.R.D. 297, 351 n. 76 (N.D.Ga.1993).

▇▇▇▇ When attorneys create a common fund from which members of a class are compensated for a common injury, they are entitled to "a reasonable fee—set by the court—to be taken from the fund." *Goldberger v. Integrated Resources, Inc.,* 209 F.3d 43, 47 (2d Cir.2000) (citation omitted); *see also* 15 U.S.C. § 78u–4(a)(6) (In Exchange Act cases governed by the PSLRA, "[t]otal attorneys fees and expenses awarded by the court to counsel for

---

**50.** Lead Counsel note that the Lead Counsel firms agreed to sustain their 2004 rates in 2005. If the firms had implemented a five percent fee increase, the lodestar multiple would be approximately 3.8. Moreover, fees are not requested for work that was performed by Lead Counsel after June 30, 2005, including filing papers in support of the settlements, plans of allocation, and supplemental plan; responses to objections; and the briefing of appeals.

**51.** As previously noted, Lebowitz is General Counsel for the Comptroller of the State of New York.

**52.** The Bernstein Litowitz summary reflects that one hour was worked by an associate billing at $500 an hour.

**53.** An objection to attorneys' fees and expenses filed by Moulton was withdrawn by her counsel at the Fairness Hearing.

It is unclear whether Selfe has standing to object to the application for attorneys' fees

and expenses. The Lead Plaintiff represents that its records indicate that Selfe's only Class Period Acquisition of WorldCom Securities was through a stock split on December 31, 1999, a transaction that does not qualify as a true acquisition, and that Selfe did not file a proof of claim. Selfe submitted a reply stating that she did indeed "acquire" WorldCom securities during this period, but she submits nothing to substantiate this claim. Selfe also notes that she filed a proof of claim, but that it was late "through oversight." In any event, this Opinion must consider the question whether the attorneys' fees sought are reasonable, and thus, the substance of Selfe's objection is squarely addressed.

The Court is also in receipt of a letter from Gary L. Soderberg, who states, "I understand that there are many reasons for these [attorneys'] fees but this quantity appears prodigious." The substance of his concerns is likewise addressed in the discussion below.

the plaintiff class shall not exceed a reasonable percentage of the amount of any damages and prejudgment interest actually paid to the class."). Determination of "reasonableness" is within the discretion of the district court. *Goldberger*, 209 F.3d at 47. There are two methods by which the court may calculate reasonable attorneys' fees in a class action, the lodestar method and the percentage method. Applying either method, the court should consider the following factors, known as the *Goldberger* factors: (1) the time and labor expended by counsel; (2) the magnitude and complexities of the litigation; (3) the risk of the litigation; (4) the quality of representation; (5) the requested fee in relation to the settlement; and (6) public policy considerations. *Visa*, 396 F.3d at 121 (citing *Goldberger*, 209 F.3d at 50).

The lodestar method "calculates attorneys' fees by multiplying hours reasonably expended against a reasonable hourly rate." *Id.* at 123 n. 27. The court may determine that an enhancement of the lodestar is warranted "based on factors such as the riskiness of the litigation and the quality of attorneys." *Id.*; *see also Savoie v. Merchants Bank*, 166 F.3d 456, 460 (2d Cir.1999) (applying the lodestar steps).

 Under the percentage method, the fee award is simply "some percentage of the fund created for the benefit of the class." *Savoie*, 166 F.3d at 460. "The trend in this Circuit is toward the percentage method, which directly aligns the interests of the class and its counsel and provides a powerful incentive for the efficient prosecution and early resolution of litigation." *Visa*, 396 F.3d at 121 (citation omitted). This method has been found to be a solution to various problems inherent in the lodestar method, which "creates an unanticipated disincentive to early settlements, tempts lawyers to run up their hours, and compels district courts to en-

gage in a gimlet-eyed review of line-item fee audits." *Id.* at 121. Because of the practical and policy advantages of the percentage method, as well as the PSLRA's express contemplation that the percentage method will be used to calculate attorneys' fees in securities fraud class actions, 15 U.S.C. § 78u–4(a)(6), this Opinion will apply the percentage method, with the lodestar used only as a cross-check of the reasonableness of the percentage of fees requested. *Cf. Visa*, 396 F.3d at 123. Where the lodestar fee is used as "a mere cross-check" to the percentage method of determining reasonable attorneys' fees, "the hours documented by counsel need not be exhaustively scrutinized by the district court." *Goldberger*, 209 F.3d at 50.

 Like the attorneys' fees awarded to Lead Counsel pursuant to the Citigroup Settlement, the fee request considered here accords with the retainer agreement negotiated in 2003 by the NYSCRF and Lead Counsel (the "Retainer Agreement") and has been submitted with the approval of the Lead Plaintiff. The Retainer Agreement was described in the December 11, 2003 notice to the class of the pendency of the class action, as well as in the notice of the proposed Citigroup Settlement mailed to Class Members in August 2004, and is posted on the Lead Counsel Website. The grid allows Lead Counsel to collect a higher fee for recoveries achieved in later stages of the litigation, but at the same time, provides for a lower percentage of recovery as the amount of recovery for the Class increases. The Retainer Agreement also adopted a lodestar ceiling for attorney's fees. For any recovery for the Class that exceeds $500 million, the attorney's fee is not to exceed the lesser of the grid amount or five times the lodestar. At the conclusion of the litigation, the NYSCRF may under certain circumstances adjust the fee so that it does not exceed four times the lodestar figure. The

Retainer Agreement also imposes caps on certain expenses.

A district court is not required to adhere to a retainer agreement such as the one used to determine the fee amount requested here. *See Visa,* 396 F.3d at 123–24. Nonetheless, when class counsel in a securities lawsuit have negotiated an arm's-length agreement with a sophisticated lead plaintiff possessing a large stake in the litigation, and when that lead plaintiff endorses the application following close supervision of the litigation, the court should give the terms of that agreement great weight. *See In re Cendant Corp. Litig.,* 264 F.3d 201, 282 (3d Cir.2001) (concluding that fee agreements between class counsel and the lead plaintiff enjoy "a presumption of reasonableness" under the PSLRA); *WorldCom,* 2004 WL 2591402, at *20 (applying presumption of reasonableness where the Lead Plaintiff conscientiously supervised the work of Lead Counsel and endorsed the fee request). The establishment of criteria for the appointment of a lead plaintiff capable of exercising a significant supervisory role in the litigation, including management of the fees and costs, was an important innovation of the PSLRA. *See* Jill E. Fisch, *Lawyers on the Auction Block: Evaluating the Selection of Class Counsel by Auction,* 102 Colum. L.Rev. 650, 702–03 (2002) ("[T]he lead plaintiff provision [of the PSLRA] was designed to enable large, sophisticated investors to investigate, negotiate with, and monitor class counsel."); 15 U.S.C. § 78u–4(a)(3)(B)(1) (providing that the lead plaintiff shall be "the member ... of the purported plaintiff class that the court determines to be most capable of adequately representing the interests of class members"); *id.* § 78u–4(a)(3)(B)(iii)(bb) (listing, as one of three factors establishing a rebuttable presumption of "most adequate plaintiff" status, "the largest financial interest in the relief sought by the class").

The NYSCRF is the second largest public pension fund in the United States and lost over $300 million on WorldCom investments. *See WorldCom,* 219 F.R.D. at 275. It has been actively involved in overseeing every aspect of the litigation. Lebowitz attests that his office "carefully reviewed and analyzed" Lead Counsel's daily time and expense records and the hourly rates for each attorney and paraprofessional who worked in the case. The NYSCRF did not shy away from exercising its negotiating power to rein in attorneys' fees; as noted above, it refused to allow the Lead Counsel firms to raise their rates for 2005 for purposes of calculating the lodestar fee—"a significant concession," according to Lebowitz. Furthermore, the Retainer Agreement was not finalized until June 2003, after indictments had been filed against WorldCom officers and after a significant ruling had been issued on the motions to dismiss. *WorldCom,* 294 F.Supp.2d 392. The risks and rewards of the litigation were therefore clearer than they would have been at the inception of the lawsuit, further informing negotiations regarding the fee grid. All these facts weigh in favor of abiding by the Retainer Agreement.

The *Goldberger* factors similarly weigh in favor of approval of Lead Counsel's fee request. The fee request is well within the range of other awards courts have approved in mega-fund litigation.[54] *Visa*

---

**54.** It is noteworthy that William Lerach, who is now a named partner in the law firm Lerach Coughlin Stoia Geller Rudman Robbins LLP, actively solicited pension funds across the country to opt out of the WorldCom class action and file individual actions under a retainer agreement that provided a base fee of 12 or 13%, plus expenses, and a cap of 17%. *WorldCom,* 2003 WL 22701241, at *4. Those pension funds which accepted that solicitation run the risk of paying a hefty premium to their counsel over and above the attorneys'

itself approved attorneys' fees that constituted 6.5% of $3.383 billion in compensatory relief recovered for the class. The lodestar multiple in that case was 3.5, but the court cited a district court's statement that multipliers of between 3 and 4.5 are common. *See Visa*, 396 F.3d at 123 (quoting *In re NASDAQ Market–Makers Antitrust Litigation*, 187 F.R.D. 465, 489 (S.D.N.Y. 1998)). A number of other cases cited by Lead Counsel support the appropriateness of Lead Counsel's fee request on a percentage basis. *See, e.g., In re Lucent Techs., Inc. Sec. Litig.*, 327 F.Supp.2d 426, 445 (D.N.J.2004) (approving a fee constituting 17% of a $517 million common fund); *Shaw v. Toshiba Am. Info. Sys., Inc.*, 91 F.Supp.2d 942, 988 (E.D.Tex.2000) (approving a fee of 7% of a common fund valued at $2.1 billion); *NASDAQ*, 187 F.R.D. at 488–89 (approving a fee constituting 14%, or a 3.97 lodestar multiple, of a $1.027 billion common fund); *see also* cases cited *id.* at 487. *But see In re Cendant Corp. Litig.*, 243 F.Supp.2d 166, 172 (D.N.J.2003) (in "a simple case in terms of liability ... settled at an early stage, after little formal discovery," awarding only 1.7% of a $3.2 billion settlement (citation omitted)).[55]

The magnitude and complexity of this litigation are well-recognized. The Lead Plaintiff asserted damages claims of over $10 billion for bondholders and scores of billions of dollars in losses to WorldCom stockholders. The disclosure of the fraud led to the largest bankruptcy in American history and spurred an extraordinary

quantity of litigation, the centerpiece of which was this class action. Because there was so much at stake, the parties in the class action fought long and hard. The ferocity with which the parties fought to the eve of trial, and in one instance, through trial, are described in the many Opinions issued to resolve the parties' active motion practice. While the criminal and regulatory investigations were of enormous assistance to the Lead Plaintiff in its prosecution of this action, particularly in the description of the accounting manipulations, since those investigations concentrated on wrongdoing by WorldCom's insiders, they were of little assistance in the development of the Lead Plaintiff's claims against the Underwriter Defendants or even Andersen, which required the Lead Plaintiff to explain how Andersen's audits failed to comply with Generally Accepted Auditing Standards (GAAS).

The impressive extent and superior quality of Lead Counsel's efforts as of May 2004 were described in detail in the Opinion approving the Citigroup Settlement. *See WorldCom*, 2004 WL 2591402, at *17–*20. At the conclusion of this litigation, more than ever, it remains true that "the quality of representation that Lead Counsel has provided to the class has been superb." *WorldCom*, 2004 WL 2591402, at *20. The risks faced by the Class in obtaining further significant recovery in this litigation have already been described. Despite the existence of these risks, Lead

---

fees and expenses that will be paid by those who remained Class Members.

**55.** The case cited by objector Selfe, *In re Domestic Air Transportation Antitrust Litigation*, 148 F.R.D. 297, awarded attorneys' fees equivalent to 5.25% of a $305 million settlement fund. That case noted that, although fees of twenty to thirty percent are awarded in the typical common fund case, "fees in the

range of 6–10% and even lower are common in [the] context [of megafund cases]." *Id.* at 351. The fee awards cited by the court in the accompanying footnote range from 3.5% for a $618 million settlement fund to 15% for a $171 million settlement. *Id.* at 351 n. 76. Nothing in that case's analysis commands a finding that Lead Counsel's fee request is unreasonable.

Counsel obtained remarkable settlements for the Class while facing formidable opposing counsel from some of the best defense firms in the country. As Judge Sweet, one of the Settlement Judges in this litigation, aptly stated it in the *NASDAQ* case:

> The quality of opposing counsel is ... significant in considering the quality of services rendered by plaintiff's counsel, as measured by the result achieved.... The ability of Class Counsel to obtain record-breaking settlements in the face of a stubborn and well executed defense further evidences the excellent quality of petitioners' work.

*NASDAQ,* 187 F.R.D. at 488. Even with the absence of the Citigroup Defendants from the case, this litigation remained enormously complex, and much of the heavy lifting by Lead Counsel came after the Citigroup Settlement. In addition to completing fact discovery, preparing experts, undertaking discovery of the defendants' experts, and addressing a thicket of legal issues in opposition to the Underwriters', Andersen, and Roberts motions for summary judgment and the motions *in limine,* Lead Counsel faced the practical and tactical challenges of readying the cases against the Underwriter Defendants, Director Defendants, and Andersen for trial.[56] At trial against Andersen, the quality of Lead Counsel's representation remained first-rate. Lead Counsel and counsel for Andersen waged a vigorous courtroom battle, which included the submission of numerous letters to the Court and oral argument regarding evidentiary issues nearly every single day, while exhibiting impressive cordiality and professionalism toward each other and toward the Court.

The Lead Counsel firms also performed excellently on behalf of the Class in settlement negotiations. The Underwriters' Settlements were achieved after intensive negotiations with counsel for the individual Underwriter Defendants or small subsets of those defendants, and most settlements yielded funds exceeding the Citigroup Formula amount for Securities Act claims. To reach settlement agreements with the Director Defendants and the Officer Defendants, Lead Counsel and the Lead Plaintiff conducted a thorough examination of the financial status of each individual; a similar examination, performed in a flurry of activity over several short days near the end of the trial, made the Andersen Settlement possible. When negotiating the Ebbers Settlement, Lead Counsel negotiated not merely with Ebbers, but also with the U.S. Attorney's Office, MCI, and the WorldCom *ERISA Litigation* class plaintiffs' counsel, all entities with their own claims on Ebbers' resources, to construct an agreement that ultimately proved satisfactory to all concerned. Lead Counsel similarly worked with the U.S. Attorney's Office and ERISA counsel to achieve the Sullivan Settlement, and with the U.S. Attorney's Office to craft an agreement with insolvent defendants Myers and Yates. Again, Lead Counsel has not requested attorneys' fees in connection with the Ebbers, Sullivan, or Myers–Yates Settlements. The Citigroup Settlement Opinion mentioned the "cooperative spirit" that existed between Lead Counsel and Liaison Counsel for the Individual Actions. *See WorldCom,* 2004 WL 2591402, at \*19. Lead Counsel have proven themselves adept at working with other counsel representing clients with varying, sometimes competing interests in the settlement context as well.

---

**56.** As noted above, the Underwriters' and Directors' Settlements occurred on the eve of trial, and the Andersen settlement at the close of the fourth week of trial.

Public policy also supports the approval of this fee request. The size of the recovery achieved for the class—which has been praised even by several objectors—could not have been achieved without the unwavering commitment of Lead Counsel to this litigation. Several of the lead attorneys for the Class essentially devoted years of their lives to this litigation, with the personal sacrifices that accompany such a commitment. If the Lead Plaintiff had been represented by less tenacious and competent counsel, it is by no means clear that it would have achieved the success it did here on behalf of the Class. In order to attract well-qualified plaintiffs' counsel who are able to take a case to trial, and who defendants understand are able and willing to do so, it is necessary to provide appropriate financial incentives. After all, this litigation was conducted on an entirely contingent fee basis, and Lead Counsel paid millions of dollars to fund the litigation. While some significant recovery in a case of this magnitude may seem a foregone conclusion now, the recovery achieved here was never certain. It is only the size of the Citigroup and Underwriters' Settlements that make this recovery so historic, and it is likely that less able plaintiffs' counsel would have achieved far less.

There is yet another public policy benefit to be acknowledged. In this case, the work performed by Lead Counsel also inures to the benefit of those who opted out of the Class. It was Lead Counsel who developed, led, and took the bulk of the discovery in the *Securities Litigation*.

Under the terms of the Consolidation and Coordination Orders entered in the *Securities Litigation*, that discovery is available to plaintiffs' counsel in all Individual Actions. Moreover, the settlements that Lead Counsel and Lead Plaintiff achieved serve as benchmarks for recoveries in all of the Individual Actions.

Finally, the fact that an active and well-qualified Lead Plaintiff has approved this fee and that the Class has not objected to it are also appropriate to consider when judging the public policy of approving a fee award that in its aggregate gives Lead Counsel $336.1 million in fees based on a total lodestar of approximately $83.2 million. This endorsement may reflect their judgment about the integral role that competent plaintiffs' counsel play in insuring the integrity of U.S. securities markets and supplementing the enforcement work of the SEC in that regard.

*Costs and Expenses*

 Lead Counsel also seeks $10,736,948.25, plus interest, for reimbursement of expenses incurred since the Citigroup Settlement. Of this amount, $5,389,994.17 is for payment of expenses by Lead Counsel; $2,365,301.37 is owing from a litigation fund to which Lead Counsel and certain of the assisting firms had contributed;[57] $11,063.54 is for payment of the Lead Plaintiff's expenses;[58] and $2,970,589.17 is for payment to the Garden City Group, the Claims Administrator in the case, for the costs of mailing notices and processing claims for the class. In

---

57. The Citigroup Settlement had provided for the creation of a $5 million Litigation Fund out of the settlement proceeds to finance the continued prosecution of the class action against the remaining defendants, *see World-Com*, 2004 WL 2591402, at *22, but that Litigation Fund was never funded.

58. Reimbursement of Lead Plaintiff's expenses is appropriate. *See* 15 U.S.C. § 78u–4(a)(4) ("Nothing in this paragraph shall be construed to limit the award of reasonable costs and expenses ... directly relating to the representation of the class to any representative party serving on behalf of a class.").

support of the application for reimbursement of expenses, the Lead Counsel firms have submitted, in addition to the Lebowitz Affidavit mentioned above, summaries of allowed expenses from September 1, 2004, to June 30, 2005 for each Lead Counsel firm, and at the Court's request, a summary of payments to experts and consultants.

Reimbursement of the expenses sought by Lead Counsel is appropriate. *See Le-Blanc–Sternberg v. Fletcher*, 143 F.3d 748, 763 (2d Cir.1998). Lebowitz attests that the Lead Plaintiff has audited the expenses. In fact, it disallowed more than $200,000 in submitted expenses incurred since the Citigroup Settlement. The Lead Plaintiff approves of Lead Counsel's submission. As no objection remains to the amount of costs sought by Lead Counsel, and the expenses do not appear facially unreasonable, the application for reimbursement of expenses is approved.

### Conclusion

Lead Plaintiff's petition for approval of the 2005 Settlements is granted, with the three alterations to the Supplemental Plan, as noted above. Lead Counsel's application for attorneys' fees and expenses for the 2005 Settlements is also granted.

SO ORDERED: